**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| Tigo Energy Innovations LLC,<br>Plaintiff,<br>v.<br>Enphase Energy, Inc.,<br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 7:26-cv-00328<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Tigo Energy Innovations LLC ("Plaintiff" or "Tigo"), by its attorneys, hereby alleges patent infringement against Defendant Enphase Energy, Inc. ("Defendant" or "Enphase") as follows:

## INTRODUCTION

1. This is an action for patent infringement under the United States Patent Laws, 35 U.S.C. § 1 *et seq*.

2. Tigo is the owner by assignment of the following U.S. Patent Nos.: 8,102,074 ("'074 Patent"); 8,274,172 ("'172 Patent"); 8,823,218 ("'218 Patent"); 8,860,241 ("'241 Patent"); 9,124,139 ("'139 Patent"); 9,143,036 ("'036 Patent"); 9,397,612 ("'612 Patent"); 9,966,848 ("'848 Patent"); 10,135,385 ("'385 Patent"); and 10,256,770 ("'770 Patent") (collectively, the "Tigo Patents"). Copies of the Tigo Patents are attached to this Complaint as Exhibits 1–10.

3. The Tigo Patents originated with Tigo Energy, Inc. ("TE"). TE has been a leader and innovator for many years in developing technology for module-level rapid shutdown of

photovoltaic ("PV") panels. TE's products include module-level rapid shutdown units that attach to PV panels. TE has delivered more than 2 million rapid shutdown products to end users.

4. For more than a decade, TE has focused on module-level technologies that address long-recognized challenges in PV system operation, including safe shutdown, system monitoring, and coordinated control across diverse system architectures. As a result of its pioneering work, TE was awarded multiple patents related to module-level rapid shutdown and has participated in industry efforts addressing the implementation and interoperability of rapid-shutdown technologies. TE has been active in enforcing and licensing its patents, including the Tigo Patents.

5. Tigo holds and enforces patents originating with TE, including the Tigo Patents. Tigo has acquired all rights and title to the Tigo Patents.

6. The Tigo Patents generally relate to technologies used in photovoltaic systems to monitor, control, communicate with, and safely manage PV modules and the electrical power generated by those modules.

7. In a typical solar installation, PV systems use power electronics to convert and manage the electricity generated by PV modules for use in homes and delivery to the electric grid.

8. The Tigo Patents disclose improvements to the way such systems monitor, control, communicate with, and safely manage solar modules and the electrical power generated by those modules.

9. Among other things, the Tigo Patents address technological problems arising from the distributed nature of solar installations. Solar modules may be physically distributed throughout a rooftop or other installation site, electrically interconnected in various configurations, and coupled to one or more inverters or controllers. The patents disclose, for example, systems and methods for controlling output from solar modules; communicating over power lines; monitoring system

status, electrical conditions, and module performance; limiting voltage or power output; identifying and authenticating module-level devices; supplying auxiliary power to controller and communications circuitry; and automatically shutting down, disconnecting, bypassing, or reducing the output of solar panels under specified conditions, including abnormal, emergency, or communication-loss conditions.

10. These improvements are important because solar-energy systems must operate efficiently under changing environmental and electrical conditions while also satisfying safety, monitoring, communication, and grid-interconnection requirements. The technologies disclosed in the Tigo Patents improve the ability of a solar-energy system to coordinate module-level devices, manage voltage and power output, transmit control and sensor information across existing power wiring, and respond to system conditions without requiring dedicated communication wiring or purely centralized control.

11. Enphase makes, uses, sells, offers to sell, imports, and/or supplies solar-energy products and systems that include module-level and system-level power electronics used to control, convert, monitor, communicate with, and/or safely manage PV modules and PV arrays. These products include, without limitation, Enphase IQ Series Microinverters, including microinverters incorporated into AC modules; IQ Gateways and Envoys; IQ Combiners; current transformers and IQ Meter Collar products; IQ Cables and related branch-circuit components; Enphase monitoring and management software, and related Enphase system components configured and operated with PV modules (collectively, the "Accused Products").

12. While a number of other companies that manufacture and sell solar-energy products and systems have licensed the Tigo Patents, Enphase has not. Tigo attempted to resolve Enphase's infringement without litigation and approached Enphase to take a license to Tigo's patented

technology. Enphase refused. In light of existing licensees paying for the right to utilize Tigo's innovative technology, and Enphase's ongoing violations of Tigo's intellectual property rights, Tigo initiated this litigation against Enphase.

13. Enphase has directly infringed and continues to directly infringe one or more claims of the Tigo Patents, as alleged in the patent-specific counts below, by making, using, selling, offering to sell, and/or importing Accused Products that embody asserted apparatus and computer-readable-storage-medium claims; making and using complete Enphase systems that meet asserted system claims; and using the Accused Products and complete systems in ways that perform asserted method claims.

14. Enphase has also indirectly infringed and continues to indirectly infringe one or more claims of the Tigo Patents, as alleged in the patent-specific counts below. Enphase has actively induced infringement by intentionally instructing, encouraging, and assisting distributors to sell and supply accused articles and installers, customers, and end users to assemble, install, configure, commission, operate, test, and use the Accused Products in complete infringing systems and in the performance of claimed methods. Enphase has also contributed to infringement by supplying particular circuitry, firmware, software, and configured components identified below that constitute material parts of the claimed inventions, are especially made or adapted for use in infringement, and are not staple articles or commodities of commerce suitable for substantial noninfringing use in their accused configurations.

15. Tigo seeks damages and other relief for Enphase's infringement of the Tigo Patents. During the applicable damages periods, Tigo, its predecessors in interest, and licensees complied with 35 U.S.C. § 287(a) to the extent applicable, as further alleged below. Tigo also asserts method claims and seeks damages on those claims to the extent § 287(a) does not apply.

16. Marking under 35 U.S.C. § 287(a) is relevant to each of the Tigo Patents to the extent Tigo asserts one or more claims under each patent directed to a patented article, including a system, apparatus, photovoltaic panel, or non-transitory computer-readable storage medium.

17. During the applicable damages periods, Tigo and its predecessors in interest, including Tigo Energy, Inc., complied with 35 U.S.C. § 287(a) with respect to the ’074, ’172, ’218, ’241, ’139, ’036, ’612, ’848, ’385, and ’770 Patents. Substantially all products practicing those patents that were made or sold by or for the applicable patent owner were appropriately marked as required by the statute, including through virtual marking where applicable. For example, the virtual-marking page at https://www.tigoenergy.com/patents identifies Tigo-branded rapid-shutdown products and associates those products with the applicable patent numbers.

18. Licenses under the Tigo Patents require licensees to mark licensed products in compliance with 35 U.S.C. § 287(a). Compliance with those requirements has been reasonably monitored by Tigo and prior owners of the Tigo Patents. Based on those marking requirements and monitoring practices, all or substantially all licensed products practicing the Tigo Patents were appropriately marked as required by the statute, including through virtual marking where applicable. For example, the virtual-marking page at https://www.tigoenergy.com/rsdvirtualmarking identifies relevant licensees and licensed products and associates those products with the applicable patent numbers.

19. Enphase received actual notice of Tigo’s specific infringement allegations no later than the filing and service of this Complaint and had earlier patent-specific knowledge as alleged below.

## BACKGROUND

### A. Solar Systems and Rapid-Shutdown Technology

20. A residential roof-top solar PV system includes multiple subsystems that operate together to convert sunlight into usable electricity. First, PV modules (colloquially referred to as solar panels) contain semiconductor cells that generate direct current ("DC") electricity when exposed to sunlight through the photovoltaic effect. Second, one or more inverters convert that DC electricity into alternating current ("AC"), which is the standard form of electricity used by residential loads and required for interconnection with the utility grid. Third, the system includes balance-of-system components such as DC and AC wiring, junction boxes, disconnects, mounting hardware, and monitoring equipment that electrically and mechanically integrate the PV modules and inverter into the home's electrical system. *See, e.g.*, U.S. Dep't of Energy, *How Does Solar Work?*, https://www.energy.gov/cmei/systems/how-does-solar-work (last visited Aug. 6, 2026); U.S. Dep't of Energy, *Solar Photovoltaic System Design Basics*, https://www.energy.gov/cmei/systems/solar-photovoltaic-system-design-basics (last visited Aug. 6, 2026).

21. PV systems include electrical conductors and components on or within buildings that may present electrical hazards while the system is generating, storing, converting, or delivering power. During emergencies, grid outages, disconnection events, or maintenance, first responders or service personnel may need access to the areas where the PV array, associated wiring, or other system equipment are installed without risk of electrocution. To address this problem, the industry has adopted safety architectures that allow voltage in controlled PV-system conductors and equipment to be reduced to prescribed levels when required. These features are commonly referred to as "rapid shutdown" functionality.

22. Rapid shutdown is a safety feature designed to quickly reduce voltage in controlled PV-system conductors to prescribed levels following rapid-shutdown initiation, such as when

utility power is lost, an emergency disconnect is activated, or first responders require access to the area. Rapid shutdown is intended to mitigate the risk of electric shock to firefighters, installers, inspectors, and homeowners during emergency or maintenance situations. *See* Nat'l Fire Prot. Ass'n, *NFPA 70*, *National Electrical Code* § 690.12 (2023) ("NEC"); *see also* Enphase Energy, Inc., *National Electrical Code Compliance - Enphase Microinverter System*, TEB-00008-1.0, at 2–3 (May 2023), https://enphase.com/download/nec-2017-2020-and-2023-enphase-system-code-compliance.

23. Rapid shutdown may be implemented through module-level power electronics ("MLPE"), including microinverters, power optimizers, and dedicated rapid-shutdown devices located at or near individual PV modules. When rapid shutdown is triggered, the voltage outside a defined boundary (generally at or near the array) is reduced to levels specified by applicable electrical safety standards, while allowing normal power generation and grid interaction during standard operation. *See* NEC § 690.12; Enphase Energy, Inc., *National Electrical Code Compliance - Enphase Microinverter System*, TEB-00008-1.0, at 2–3 (May 2023), https://enphase.com/download/nec-2017-2020-and-2023-enphase-system-code-compliance; Enphase Energy, Inc., *Understanding Rapid Shutdown for Solar* (May 20, 2025), https://enphase.com/blog/homeowners/understanding-rapid-shutdown-solar.

24. Several of the Tigo Patents relate to and cover technologies that enable this module-level control by combining distributed devices located at individual PV modules with centralized signaling or control mechanisms that coordinate system operation. Other Tigo Patents address complementary technologies, including for example communicating data over power conductors, authenticating module-level devices and efficiently supplying auxiliary power to control circuitry.

### B. Distributed Monitoring, Command, and Watchdog Architecture

25. Several of the Tigo Patents disclose distributed solar-control architectures in which a master, remote, or system-level controller communicates with module-level devices and monitors communications, sensors, or system conditions. Depending on the particular architecture, the system-level controller may evaluate monitored conditions, determine whether a change in operation is required, and communicate with module-level devices to implement a responsive control action. *See, e.g.*, Ex. 10 at 19:55–20:9 ('770 Patent); Ex. 7 at 19:33–61, 20:5–24, 48–61 ('612 Patent); Ex. 3 at 19:39–51, 20:53–21:6 ('218 Patent).

26. In implementations relevant to the asserted claims, a master, remote, or system-level controller receives or monitors information concerning sensor or system conditions, determines whether an operational response is required, and communicates with module-level devices to implement that response. The module-level devices respond by controlling associated power-conversion circuitry or module output, including by limiting production, changing an operating state, or shutting down output when required. *See, e.g.*, Ex. 10 at 19:55–20:25 ('770 Patent); Ex. 7 at 19:33–61, 20:1–47 ('612 Patent); Ex. 3 at 19:39–59, 20:53–21:6 ('218 Patent).

27. These distributed-control architectures allow system-level conditions to be evaluated while responsive action is implemented at or near individual PV modules. They enable coordinated control across many modules and support rapid responses to abnormal or emergency conditions, production limiting, safe shutdown, and other system-control functions.

28. The inventions claimed in several of the Tigo Patents protect multiple variations of these distributed-control technologies. Depending on the particular patent and claim, the claimed functionality may include monitoring sensors or system conditions, detecting anomalies, determining whether a control change is required, issuing responsive control commands, limiting

or shutting down module output, communicating over power conductors, or identifying and authenticating module-level devices.

### C. Commercial Deployment, Practical Implementation, and Alignment with Industry Standards and Safety Requirements

29. The inventions claimed in the Tigo Patents have been implemented in commercially deployed PV systems and embodied in products designed for installation at scale. These products include module-level devices installed in proximity to PV panels and associated signaling components used to coordinate system-wide operation.

30. Many commercially deployed PV products that practice the Tigo Patents are manufactured and sold under license from Tigo. Tigo's virtual-marking page identifies many of those licensees and licensed products and associates the identified products with the applicable Tigo Patents. *See* https://www.tigoenergy.com/rsdvirtualmarking.

31. Through commercial deployment, these solutions enable PV installations to meet applicable safety requirements while preserving normal system performance during routine operation. The widespread use of such architectures in real-world installations demonstrates that the technologies claimed in the Tigo Patents provide practical, concrete engineering solutions to longstanding problems in PV system safety and control.

32. PV system safety requirements in the United States are reflected in the NEC, including § 690.12, which requires PV systems installed on or in buildings to include a rapid-shutdown function to reduce shock hazards for emergency responders.

33. To support compliance with these requirements across multi-vendor systems, industry participants have developed interoperability specifications and certification programs, including those promoted by the SunSpec Alliance. These efforts seek to define standardized system

architectures and communication behaviors that allow inverters, transmitters, and module-level devices from different manufacturers to operate together in a safe and predictable manner.

34. For example, the SunSpec Communication Signal for Rapid Shutdown ("RSD") Specification defines "a multi-vendor, multi-device" communication interoperability specification to support NEC 2014, NEC 2017, and UL 1741 module-level rapid-shutdown requirements.

35. The SunSpec RSD Specification describes a rapid-shutdown communication system that includes initiators, transmitters, and receivers. During normal operation, a transmitter sends a "permission to operate" signal to module-level receivers. When rapid shutdown is initiated, the transmitter stops sending that signal and the receivers respond by reducing voltage at the module level.

36. This architecture, which combines centralized signaling with distributed module-level response, illustrates the importance of reliable communications and coordinated device-level control to the safe and interoperable operation of PV systems. TE developed and patented important technologies addressing these and other challenges associated with rapid shutdown and module-level control.

37. TE actively participated in the SunSpec rapid-shutdown specification process. The SunSpec RSD Specification identifies TE personnel among the companies and individuals involved in that process, including Gal Bauer, Vered Sharon, Bijay Shrestha, and Danny Eizips.

38. In connection with that participation, TE notified SunSpec that TE held patents covering technologies relevant to the rapid-shutdown systems addressed through the SunSpec process. Those disclosures informed SunSpec and participating members of TE's patent rights concerning rapid-shutdown technology.

39. A SunSpec Member's Briefing dated November 1, 2017, documented TE's identification of patent claims in connection with the SunSpec RSD Specification, including claims 1, 9, and 17 of the '172 Patent, among others. *See* https://sunspec.org/wp-content/uploads/2019/08/SunSpecRapidShutdownBriefing20171101.pdf.

40. TE subsequently provided additional notice concerning patents issued after its initial disclosure. In correspondence dated May 20, 2021, TE identified additional rapid-shutdown patents relevant to the technologies addressed by the SunSpec RSD Specification, including the '770 Patent. Ex. 10.

41. On information and belief, TE's participation and disclosures made its rapid-shutdown innovations and associated patent rights known within the PV industry, including among companies participating in the development and implementation of rapid-shutdown technologies.

42. Enphase separately obtained actual knowledge of Tigo's patent rights no later than its 2026 licensing correspondence with Tigo. On January 2, 2026, Tigo informed Enphase of the Tigo Patents. In a February 2, 2026, letter, Enphase stated that it had no interest in licensing Tigo's patents. *See* Exs. 13–14.

43. Despite its knowledge of Tigo's patent rights, Enphase has not obtained a license to the Tigo Patents and has continued the acts of infringement alleged below.

### D. The Tigo Patents

44. The Tigo Patents generally relate to complementary technologies for the safe, reliable, and coordinated operation of distributed PV systems. These patents disclose, among other things, systems and methods for monitoring electrical and system conditions; controlling or limiting solar-module output and PV-system voltage; issuing control commands in response to detected anomalies; communicating data over photovoltaic power conductors; identifying and authenticating module-level devices; and reliably supplying auxiliary power to control circuitry.

Although directed to different aspects of PV-system operation, the patents share a common focus on coordinating system-level and module-level components to communicate, control power production, and respond appropriately when communications are lost, an abnormal or emergency condition is detected, or specified operating conditions are not satisfied.

45. More specifically, the ’074 Patent, entitled *Systems and Method for Limiting Maximum Voltage in Solar Photovoltaic Power Generation Systems*, was duly and legally issued on January 24, 2012. Tigo is the owner and assignee of all substantial rights in the ’074 Patent.

46. The ’074 Patent addresses controlling the operation of solar modules so that PV-system voltage does not exceed an applicable maximum level. The patent discloses systems and methods in which local management units control the voltage contributed by individual solar modules to maintain system voltage within the applicable limit.

47. The ’172 Patent, entitled *Systems and Method for Limiting Maximum Voltage in Solar Photovoltaic Power Generation Systems*, was duly and legally issued on September 25, 2012. Tigo is the owner and assignee of all substantial rights in the ’172 Patent.

48. The ’172 Patent addresses a related problem in PV systems: controlling or limiting voltage in a PV system so that the voltage does not exceed regulatory or safety limits. The ’172 Patent discloses monitoring voltage and limiting the voltage output of one or more solar modules based on a maximum regulatory or safety voltage. The patent teaches that a controller, local management units, or a controlling local management unit can monitor currents or voltages, analyze whether a voltage threshold may be exceeded, and control module output to prevent voltages from exceeding safety limits.

49. The ’218 Patent, entitled *System and Method for Enhanced Watch Dog in Solar Panel Installations*, was duly and legally issued on September 2, 2014. Tigo is the owner and assignee of all substantial rights in the ’218 Patent.

50. The ’218 Patent addresses automated shutdown, disconnection, power reduction, and other responsive control in solar-panel installations using master management units, local management units, sensors, and control commands. The patent discloses a master management unit connected to a sensor configured to detect an anomaly and, upon detection of the anomaly, sending a command to a local management unit to alter the state of an associated solar module. The local management unit, upon receiving the command, alters the state of one or more solar modules in accordance with the command.

51. The ’218 Patent was challenged in an inter partes review petition filed by SMA Solar Technology America, LLC (“SMA”). The Patent Trial and Appeal Board (“PTAB”) instituted review of claims 1–19, but the proceeding was terminated following settlement before the PTAB issued a final written decision or reached a final determination on the merits. *SMA Solar Technology America, LLC v. Tigo Energy, Inc.*, IPR2023-01184 (P.T.A.B. terminated Aug. 28, 2024).

52. The ’241 Patent, entitled *Systems and Methods for Using a Power Converter for Transmission of Data Over the Power Feed*, was duly and legally issued on October 14, 2014. Tigo is the owner and assignee of all substantial rights in the ’241 Patent.

53. The ’241 Patent addresses power-line communications in photovoltaic systems. The patent discloses using a controller to control switching circuitry in a power converter and modulating that control with data so that the data is transmitted over the same power conductors used to deliver energy from the photovoltaic system.

54. The ’139 Patent, entitled *Systems and Methods for an Identification Protocol Between a Local Controller Coupled to Control a Solar Module and a Master Controller*, was duly and legally issued on September 1, 2015. Tigo is the owner and assignee of all substantial rights in the ’139 Patent.

55. The ’139 Patent addresses identification and authentication between module-level and system-level controllers. The patent discloses a local management unit communicating an identification code to a master management unit, receiving an authentication of that identification code, and continuing active operation in response to the authentication. The disclosed authentication functionality can be used to verify that system components and communications are authorized, legitimate, and secure.

56. The ’036 Patent, entitled *Systems and Methods for Enhanced Efficiency Auxiliary Power Supply Module*, was duly and legally issued on September 22, 2015. Tigo is the owner and assignee of all substantial rights in the ’036 Patent.

57. The ’036 Patent addresses auxiliary power-supply circuitry for photovoltaic systems. The patent discloses a first-stage power converter, a second-stage power converter that supplies power to a microcontroller, and circuitry that prevents the second stage from supplying power until a capacitor coupled to the first-stage output has been charged to a level sufficient to operate the microcontroller for a predetermined period.

58. The ’612 Patent, entitled *System and Method for Enhanced Watch Dog in Solar Panel Installations*, was duly and legally issued on July 19, 2016. Tigo is the owner and assignee of all substantial rights in the ’612 Patent.

59. The ’612 Patent is related to the ’218 Patent and addresses additional sensor-based monitoring and control functionality. The patent discloses systems and methods in which a master

control unit monitors a sensor for an anomaly, determines whether the anomaly requires a control change, and issues a control-change command to a local management unit. The disclosed commands include commands to shut down or disconnect system components and commands to alter the output of a solar module.

60. The ’848 Patent, entitled *Systems and Methods for Enhanced Efficiency Auxiliary Power Supply Module*, was duly and legally issued on May 8, 2018. Tigo is the owner and assignee of all substantial rights in the ’848 Patent.

61. The ’848 Patent addresses controlling the startup and operation of a second-stage power converter that supplies power to a microcontroller. The patent discloses a control circuit that monitors the output of a first-stage power converter, causes the second stage to remain in a mode that does not power the microcontroller while the monitored voltage is below a threshold, and enables the second stage to power the microcontroller when the voltage exceeds the threshold.

62. SMA also petitioned for inter partes review of all claims of the ’848 Patent. The PTAB denied institution, concluding that SMA had not demonstrated a reasonable likelihood of prevailing in showing that any challenged claim was unpatentable. The PTAB subsequently denied SMA’s request for rehearing. *SMA Solar Technology America, LLC v. Tigo Energy, Inc.*, IPR2023-01175, Paper 12, at 16 (P.T.A.B. Jan. 22, 2024), reh’g denied, Paper 14, at 8 (P.T.A.B. Apr. 2, 2024).

63. The ’385 Patent, entitled *Identification Protocol Between a Local Controller of a Solar Module and a Master Controller*, was duly and legally issued on November 20, 2018. Tigo is the owner and assignee of all substantial rights in the ’385 Patent.

64. The ’385 Patent addresses identification and authentication functionality related to that addressed in the ’139 Patent, involving multiple local management units associated with solar

modules and a master management unit. The claimed technologies include communicating identification codes, receiving authentication of those codes, and continuing active operation of the authenticated local management units, including continued operation according to their normal or default profiles or configurations.

65. The ’770 Patent, entitled *System and Method for Enhanced Watch Dog in Solar Panel Installations*, was duly and legally issued on April 9, 2019. Tigo is the owner and assignee of all substantial rights in the ’770 Patent.

66. The ’770 Patent discloses distributed solar-control architecture using one or more master management units and one or more local management units. In the disclosed system, the master management units communicate with local management units during operation. The master units may be connected to controllers and emergency detection sensors, and, when a sensor detects an emergency, the master unit can instruct associated local units to take action. If communications with the master unit are cut off, the local management units can independently shut down, disconnect, or reduce output from associated PV modules.

67. The ’770 Patent has been the subject of two inter partes review petitions. In IPR2021-00540, the petitioner challenged claims 12–16, but the PTAB dismissed the petition without instituting review after the parties settled. *Altenergy Power Systems Inc. v. Tigo Energy Inc.*, IPR2021-00540, Paper 8 (P.T.A.B. May 3, 2021). In IPR2021-01287, SunSpec Alliance challenged claims 12–16. The PTAB determined claims 12 and 13 unpatentable but found that SunSpec had not demonstrated the unpatentability of claims 14–16. The Federal Circuit affirmed the PTAB’s decision as to all grounds concerning the ’770 Patent. *SunSpec Alliance v. Tigo Energy, Inc.*, IPR2021-01287, Paper 27 (P.T.A.B. Jan. 30, 2023), aff’d, Nos. 2023-1741, 2023-1742, slip op. at 9 (Fed. Cir. Aug. 5, 2025) (nonprecedential).

## ENPHASE'S INFRINGEMENT

68. Enphase makes and sells equipment used in residential systems for generating solar energy. Enphase's systems convert sunlight into electricity for residential use. Enphase systems use PV panels to capture energy in the form of photons and convert them into electricity. *See* https://enphase.com/learn/home-energy/solar-basics/how-does-solar-work.

69. PV panels (also called solar panels) output direct-current (DC) electricity. By contrast, household electrical systems typically use alternating-current (AC) electricity. Residential solar systems, therefore, use one or more inverters to convert the DC electricity to AC electricity. Unused energy captured by the PV panel can be stored in a battery or sent to the electrical grid for later use. *See id.*




70. Enphase systems use microinverters, which are installed at or near each PV panel, to convert the DC electricity generated by each PV panel to AC electricity for use in the home. *See id.*; *see also* https://enphase.com/learn/home-energy/solar-basics/types-solar-inverter-microinverter-string-inverters.

71. Enphase further advertises "built-in Enphase rapid shutdown technology" to "ensure[] the entire system can be quickly de-energized by turning off a single breaker." *See* https://enphase.com/learn/home-energy/solar-basics/how-does-solar-work. Each Enphase

microinverter has built-in rapid shutdown capability. Rapid shutdown is mandated by the National Electrical Code ("NEC") for PV systems installed on or in buildings to reduce electrical hazards by rapidly lowering voltage in controlled PV-system conductors following shutdown initiation. *See* https://enphase.com/blog/homeowners/understanding-rapid-shutdown-solar.

72. Rapid shutdown in Enphase systems can be activated manually by pressing a dedicated shutdown switch or an emergency stop button. Rapid shutdown can further be activated automatically when there is a grid disconnection, an AC breaker trip, or an inverter fault detection. *See id.*

73. Systems using Enphase microinverters connect to and monitor a utility grid, such that AC power is exported only when the utility grid is available and operating within specified requirements. When the utility grid fails, or the PV system AC circuits are disconnected from the utility service via an AC breaker, AC disconnect, or removal of the solar or main utility service meter, the microinverters stop producing AC power. For example, the IEEE 1547 standard requires that grid-tied or utility-interactive inverters cease power production if voltage measured at the inverter terminal exceeds +10% or -12% of nominal voltage. Enphase states that its microinverters sense voltage and frequency from the AC grid and cease exporting power when grid voltage or frequency is too high or too low. Enphase identifies the microinverter AC output as the reference point for that voltage measurement. If the voltage measured is outside the applicable limit, the Enphase microinverter enters an AC Voltage Out-Of-Range ("ACVOOR") condition and ceases to export power until this condition clears. *See* https://enphase.com/download/nec-2017-2020-and-2023-enphase-system-code-compliance; https://enphase.com/download/calculating-ac-line-voltage-rise-iq-series-microinverters-iq-cable-tech-brief.

74. On information and belief, Enphase systems also use IQ Gateways, IQ Combiners, IQ Cables, monitoring software, installer software, and related communication and control functionality. Enphase describes the IQ Gateway as providing network access to the PV array and collecting production and performance data from IQ Microinverters over on-site AC power lines.

75. On information and belief, Enphase IQ Series Microinverters communicate with IQ Gateways and/or IQ Combiners using power line communication, including to transmit, receive, monitor, process, or respond to system status, production, performance, control, configuration, grid, safety, and/or rapid-shutdown information.

76. On information and belief, Enphase also markets and configures IQ Series Microinverters as grid-interactive inverters that comply with applicable grid-interconnection standards, including IEEE 1547 and UL 1741. *See, e.g.*, https://enphase.com/download/iq7-and-iq7plus-microinverters-data-sheet; https://enphase.com/download/iq8-series-microinverters-mc4-connectors-data-sheet; https://enphase.com/download/iq9n-commercial-microinverter-data-sheet; https://enphase.com/download/iq9s-commercial-microinverter-data-sheet.

77. Among the Accused Products are Enphase IQ Series Microinverters, including, without limitation, microinverters sold under the brand names IQ7, IQ7+, IQ7A, IQ7X, IQ8, IQ8+, IQ8M, IQ8A, IQ8H, IQ9, IQ9N, and IQ9S. Enphase makes, uses, tests, sells, offers for sale, imports, supports, and/or supplies the Accused Products in the United States, including in combination with IQ Gateways and IQ Combiners, and related Enphase system components configured and operated with PV modules. *See, e.g.*, https://enphase.com/store/microinverters; https://enphase.com/store/microinverters/iq9-series.

## A. The Accused Products

78. On information and belief, Enphase products within the same product family are materially similar with respect to the particular accused functionality identified below. The IQ7

Series Microinverters discussed in the paragraphs that follow are representative of module-level power-conversion, PV-module coupling, maximum-power-point-tracking, grid-interactive, and power-line-communications functionality. Separate allegations below identify the Power Control-enabled configurations, Gateway and Combiner commissioning and authentication functionality, and IQ8MC auxiliary-power circuitry relevant to particular Tigo Patents. References to a representative product include other products within the same family only to the extent they contain the same or materially similar accused functionality. The particular products, configurations, and functions accused under each Tigo Patent are identified in the corresponding count.

79. IQ Series Microinverters convert the direct-current (DC) output of photovoltaic (PV) module (solar modules or solar panels) into grid-compliant alternating-current (AC) power (https://enphase.com/download/iq7-series-microinverters-installation-and-operation-manual). When the PV array of the PV module is exposed to light, the PV array supplies a DC voltage to power conversion equipment (PCE) included in the IQ Series Microinverters.

80. IQ Series Microinverters are described as maximizing energy production using a maximum power point tracking (MPPT) algorithm. Each microinverter individually connects to a PV module in an array, enabling an individual MPPT to control each PV module and for exporting power from each PV module to the utility grid. While an individual PV module in the array may be affected by shading, soiling, orientation, or PV module mismatch, each Enphase microinverter controls performance of a respective PV module (https://enphase.com/download/iq7-series-microinverters-installation-and-operation-manual).




(https://enphase.com/download/iq7-series-microinverters-installation-and-operation-manual)

81. Enphase instructs installers and/or end users to couple IQ Series Microinverters to PV panels.



**Step 9: Connect the PV modules**

WARNING: Electrical shock hazard. The DC conductors of this photovoltaic system are ungrounded and may be energized.

A. If required, attach the Enphase DC bulkhead adaptors to the microinverters. Ensure they are fully seated. Do not reverse the adaptor connections.
B. Connect the DC leads of each PV module to the DC input connectors of the corresponding microinverter or adapter.
C. Check the LED on the connector side of the microinverter. The LED flashes six times when the DC power is applied.
D. Mount the PV modules above the microinverters.




(https://enphase.com/download/iq7-iq7-iq7a-and-iq7x-microinverters-quick-installation-guide)

82. IQ Series Microinverters include control circuitry for controlling outputs, such as a master controller used to control boost and output modulation.



(https://www.chargerlab.com/teardown-of-enphase-iq7-microinverter-for-solar-energy/)

83. Enphase IQ Series systems use an IQ Gateway to monitor microinverter performance and, where required, provide control of IQ Series Microinverters.

The Enphase IQ System includes:

- **Enphase IQ7, IQ7+, IQ7A,** and **IQ7X Microinverters** The smart grid-ready IQ Series Microinverters convert the DC output of the PV module into grid-compliant AC power.
- **IQ Gateway** (ENV-IQ-AM1-240) The IQ Gateway is a communication device that provides network access to the PV array. The IQ Gateway collects production and performance data from the Enphase IQ Microinverters over on-site AC power lines and transmits the data to the Enphase App through an internet or cellular modem connection. The IQ Gateway can monitor up to 600 Enphase IQ Microinverters and up to 39 Enphase IQ Batteries. For details, refer to the *IQ Gateway Installation and Operations Manual.*

(https://enphase.com/download/nec-2017-2020-and-2023-enphase-system-code-compliance at 2.)

84. IQ Series Microinverters are UL Listed as PV Rapid Shut Down Equipment and conform with NEC-2014 and NEC-2017 section 690.12 and C22.1-2015 Rule 64-218 Rapid Shutdown of PV Systems, for AC and DC conductors (https://enphase.com/download/iq7-series-microinverters-installation-and-operation-manual; https://enphase.com/download/iq7-iq7-iq7a-and-iq7x-microinverters-quick-installation-guide).

85. Enphase states that its rapid-shutdown functionality may be activated automatically upon a grid disconnection, an AC breaker trip, or detection of an inverter fault. According to Enphase, the system automatically detects these conditions and initiates rapid shutdown. When rapid shutdown is activated, each IQ Series Microinverter stops converting DC to AC, effectively cutting off voltage at the module level. Enphase further states that this functionality is integrated into its microinverters and is designed to satisfy applicable National Electrical Code requirements for reducing controlled conductors to safe voltage levels following rapid-shutdown activation (https://enphase.com/blog/homeowners/understanding-rapid-shutdown-solar).

### Step 1: Activating Rapid Shutdown

Rapid Shutdown can be triggered in two ways:

- **Manual activation:** This involves pressing a dedicated shutdown switch or an emergency stop button. This is typically used in situations where immediate shutdown is necessary for safety reasons.
- **Automatic activation:** This occurs when there is a grid disconnection, an AC breaker trip, or an inverter fault detection. The system automatically detects these issues and initiates the Rapid Shutdown process to prevent any potential hazards.

### Step 2: Voltage reduction process

- In traditional systems, a Rapid Shutdown transmitter sends a signal to module-level shutdown devices, such as optimizers or microinverters, instructing them to stop power production. This ensures that the voltage is quickly reduced to safe levels.
- At Enphase, each microinverter instantly stops converting DC to AC, effectively cutting off the voltage at the module level. This immediate response enhances safety by reducing the risk of electric shock.
- According to NEC (National Electrical Code) regulations, all controlled conductors must be de-energized to 30 V or less within 30 seconds of initiating the Rapid Shutdown. This ensures that the system is safe to handle in a very short amount of time.

(https://enphase.com/blog/homeowners/understanding-rapid-shutdown-solar)

**B. Enphase IQ System Architecture and Power-Line Communications**

86. On information and belief, Enphase IQ systems include individual IQ Series Microinverters coupled to respective PV modules, with multiple Microinverters connected through Enphase IQ Cable as part of one or more AC branch circuits. Enphase describes the IQ Cable as a continuous outdoor-rated cable with integrated connectors into which the Microinverters plug directly. Each Microinverter converts DC power from its associated PV module into grid-compliant AC power, which is supplied through the IQ Cable and related AC branch-circuit components toward the IQ Combiner, load center, and utility grid. *See* https://enphase.com/download/iq7-series-microinverters-installation-and-operation-manual at 10–11, 29.

87. Enphase also describes the IQ Gateway as a communications device that provides network access to the PV array. According to Enphase, the IQ Gateway collects production and performance data from IQ Series Microinverters over the system's on-site AC power lines and transmits that information to Enphase through an internet or cellular connection. Enphase's published system diagram expressly depicts power-line communication, or "PLC," between multiple IQ Series Microinverters and an IQ Combiner containing IQ Gateway functionality. *See* https://enphase.com/download/nec-2017-2020-and-2023-enphase-system-code-compliance at 2–3. Unless otherwise stated, references in this Complaint to an "IQ Gateway" include both a standalone IQ Gateway and IQ Gateway functionality integrated into an IQ Combiner.




Figure 2: IQ Series Microinverters system configuration with rapid shutdown solution.

*Figure 1*. Enphase's published IQ Series system architecture depicts multiple IQ Microinverters communicating through PLC with an IQ Combiner containing IQ Gateway functionality. *Id.* at 3, Fig. 2.

88. The documented communications are not limited to Microinverters reporting production data to the Gateway. Enphase also instructs that an IQ Gateway is used to commission Microinverters and propagate applicable grid-profile settings. Enphase further states that an Enphase communications Gateway is required to set or change the grid profile and documents commands or messages issued through the Gateway to individual Microinverters, including

messages used to clear identified fault conditions. *See* https://enphase.com/download/iq7-series-microinverters-installation-and-operation-manual at 10, 22–24.

89. Accordingly, Enphase's documented architecture uses the system's AC-side wiring, including the IQ Cable and related branch-circuit conductors, both to convey AC power produced by the Microinverters and as a power-line-communications medium between the Microinverters and the IQ Gateway or IQ Combiner. Through that architecture, individual Microinverters transmit production, performance, status, and fault information to the Gateway, while the Gateway transmits commissioning, configuration, grid-profile, control, and other responsive communications to the Microinverters.

### C. Enphase Device Identification, Commissioning, and Authentication

90. On information and belief, each IQ Series Microinverter contains and uses a device-specific serial number or other coded device identifier. Enphase instructs installers to record the serial number assigned to each individual Microinverter and associate that serial number with the Microinverter's physical location in the PV array. Enphase further instructs installers to use the Enphase Installer App to record the Microinverter serial numbers and configure the system. *See* https://enphase.com/download/iq7-series-microinverters-installation-and-operation-manual at 19.

91. Enphase's documented commissioning process includes detecting the Microinverters, registering the system, and building a virtual array containing the detected devices. Enphase also documents that an individual Microinverter's serial number is maintained in the IQ Gateway database. When a Microinverter is replaced, for example, Enphase instructs the installer to delete the replaced Microinverter's serial number from the IQ Gateway database, add the replacement Microinverter's serial number by initiating a device scan, and add the newly detected Microinverter to the virtual array. *Id.* at 23, 28–29.

92. Enphase provides two documented processes for associating an IQ Microinverter with the IQ Gateway. The IQ Gateway may perform a device scan to identify the Microinverters deployed at the site. Alternatively, when Gateway device scanning is inhibited, Enphase instructs installers to use the Enphase Installer App scanning tool to provision the Microinverters on the IQ Gateway. These processes are performed on a device-specific basis for the separately identified Microinverters in a multi-Microinverter system. *Id.* at 28–29.


J. Add the new microinverter serial number to the IQ Gateway database by initiating a device scan using one of the following methods:
a. **Method 1: Initiate a scan using the Enphase Installer App**
- In the Enphase Installer App, once connected to the IQ Gateway, navigate to the Overview screen.
- From the Overview screen, tap **Detected > Start Device Scan** to start a new 30-minute device scan.
- If device scanning on the IQ Gateway is inhibited, the app displays **Scan Inhibited.** If you need to add more microinverters to the system when device scanning is inhibited on the IQ Gateway, you must use the Enphase Installer App scanning tool to provision them on the IQ Gateway, rather than using the IQ Gateway's device scanning function to discover them. If this is not possible and

28 © 2023 Enphase Energy Inc. All rights reserved. September 2023 IOM-00028-1.0

ENPHASE IQ7/IQ7+/IQ7X/IQ7A Microinverters Installation and Operation Manual

you need to enable device scanning on the IQ Gateway, contact Enphase Support at enphase.com/en-us/support/contact.
b. **Method 2: Use an IQ Gateway**
- Press the Device Scan button on the IQ Gateway. The IQ Gateway begins a 15-minute scan to identify all the microinverters deployed at the site. The Microinverter Communications LED flashes green during the scan.



*Figure* 2. Enphase instructs installers to associate a Microinverter's serial number with the IQ Gateway database through device discovery or provisioning and states that the IQ Gateway scans to identify the Microinverters deployed at the site. *Id.*

93. Enphase further states that the IQ Gateway is used to commission the Microinverters and propagate applicable grid-profile settings. For example, Enphase requires use of the IQ Gateway to commission Microinverters in 208 VAC installations and propagate the correct grid-profile settings for the applicable trip points. Enphase also instructs that the grid profile may be

selected during system registration and that an IQ Gateway is required to set or change the Microinverters' grid profile. *Id.* at 10, 23; *see also* https://enphase.com/download/iq-gateway-commercial-quick-install-guide.

94. On information and belief, each Microinverter separately communicates its serial number or other coded device identifier to the IQ Gateway over the system's power-line-communications network. In response to receiving the identifier, the IQ Gateway, together with the Enphase Installer App and Installer Platform, performs device-specific validation, provisioning, registration, association, and configuration operations and transmits responsive communications to the identified Microinverter, including applicable commissioning and grid-profile information. *See, e.g.*, https://enphase.com/download/iq-gateway-commercial-quick-install-guide.

95. On information and belief, this combined, responsive, device-specific process constitutes an authentication operation through which the identified Microinverter is authorized or permitted to enter or continue active operation under the commissioned settings. *Id.* The process is performed separately for multiple Microinverters within the same system.

**D. Enphase Power Control Functionality**

96. On information and belief, Enphase offers Microinverters with grid-forming technology. These Microinverters include Power Control functionality when installed with an IQ Gateway and related sensors. Enphase identifies the IQ Gateway as the Power Control System controller and states that the Gateway monitors currents reported by current transformers and uses that information to limit photovoltaic and energy-storage-system power production as required. Enphase further states that an IQ Meter Collar may be used for current sensing in place of Consumption Current Transformers. *See* https://enphase.com/download/enphase-power-control-integration-enphase-energy-system at 10–11.

97. Enphase Power Control monitors and responds to production, consumption, export, and backfeed current. For example, Enphase states that its main-panel-upgrade-avoidance functionality monitors production current, battery current, and current entering the main panel and limits photovoltaic and battery current in real time so that current entering the busbar does not exceed the applicable busbar ampacity. *Id.* at 28.

98. Enphase further describes a feeder-control configuration in which current transformers monitor current being backfed into the main panel and feed that information to the IQ Gateway. When the monitored backfeed current exceeds the applicable limit, the IQ Gateway sends a signal to the photovoltaic microinverters to limit production. On information and belief, the IQ Microinverters receive that signal and responsively change their operating and output states by limiting production from their associated photovoltaic modules. *Id.* at 30.




*Figure 51: MPU avoidance in the grid-tied configuration*

NOTE: The preceding figure shows an example with IQ Combiner 5/5C. MPU avoidance in the grid-tied configuration with IQ Battery 3T/10T and IQ Combiner 4/4C is shown in Single-line diagrams on page 51. Connecting a Battery CT in IQ Combiner 4/4C or standalone IQ Gateway requires connecting a jumper wire between the L2 and L3 terminals of IQ Gateway. Refer to the IQ Battery metering section in the Guidelines for Current Transformer (CT) Installation tech brief for instructions on connecting the battery CT on IQ Combiner 4/4C or standalone IQ Gateway.

In the preceding figure, both Production CT and battery CT are monitored, and the battery discharge is controlled first, followed by the PV production current to limit $I_{backfeed}$ entering the main DER breaker in the main panel. The main DER breaker must be sized to the PCS limit as per NEC 2020 705.13 (C).

**System sizing for MPU avoidance with NEC 120% rule and with current limit directly entered in a grid-tied system**

For example, as seen in the preceding figure, if the main load panel busbar size is 200 A and the grid-side main service breaker size is also 200 A, the maximum continuous current backfeed allowable from the IQ Combiner to the main panel, $I_{production}$, is limited to:

((120% * busbar rating) – Main service breaker size)/125% = total DER current

((120% * 200)-200)/125% = 32 A

In this scenario, the system ensures that no more than 32 A of continuous current is exported back to the main panel. The Production CT and the Battery CT placed inside the IQ Combiner will monitor the current being backfed into the main panel in real time and feed this information to the IQ Gateway. If the current being backfed to the main panel increases beyond 32 A, the IQ Gateway sends a signal to PV microinverters and the battery to limit their production and discharge, respectively.

*Figure 3*. Enphase describes its IQ Gateway sending a signal to photovoltaic microinverters to limit production in response to monitored backfeed current exceeding an applicable limit. *Id.* at 30.

99. Enphase Power Control uses the IQ Gateway to receive data concerning current conditions in the system, evaluate that data against applicable limits, determine whether a change in operation is required, and send responsive production-limiting instructions to IQ Microinverters. The IQ Microinverters then alter the output of their associated PV modules in response to the Gateway's instructions.

### E. Enphase Auxiliary-Power Architecture

100. Based on analysis of products and product information, Enphase Microinverters, including the IQ8MC Microinverter, contain internal auxiliary-power-supply circuitry that receives direct-current voltage from a corresponding PV module and supplies lower operating voltages to the Microinverter's control and communications circuitry. The internal circuitry contains a variety of components, including power-converter stages, capacitors, microcontrollers, and control circuitry connected so that the downstream circuitry changes operation as voltage rises or falls.

101. This auxiliary-power-supply circuitry includes a first stage converter having an input connected to the PV-module voltage and an output providing a different first voltage, a capacitor coupled to the first-stage output, and a second stage converter connected to receive power from the first-stage output and the capacitor and to supply power at a second voltage to a microcontroller.

102. The circuitry prevents the second stage converter from turning on and supplying power at the second voltage until the first-stage converter's output has charged the capacitor to a predetermined level sufficient to power the second stage converter and operate the microcontroller for a predetermined period even without the first-stage converter's output.

103. The capacitor and associated circuitry also function as a power-absorption circuit, and the auxiliary-power-supply circuitry includes a control circuit coupled with the first and second power-converter stages and powered by the first-stage output. When the first-stage-output voltage is below a threshold, the control circuit causes the second stage to remain in a mode that does not supply the second output to the microcontroller. When the voltage exceeds the threshold, the control circuit causes the second stage to supply the second output to the microcontroller.

104. The architecture alleged above is present in the IQ8MC Microinverter and, on information and belief, other Enphase Microinverter models containing the same or materially similar auxiliary-power-supply architecture and functionality.

**F. Enphase Prescribes Installation and Commissioning Workflows**

105. Enphase reinforces the installation and commissioning workflows alleged above by stating that, to ensure optimal reliability and meet warranty requirements, its Microinverters, IQ Cable, and related equipment must be installed in accordance with Enphase's instructions. *See* https://enphase.com/download/iq7-series-microinverters-installation-and-operation-manual at 4, 6; https://enphase.com/download/iq8-series-microinverter-installation-guide at 2.

106. Enphase reinforces the prescribed workflows alleged above through the Enphase Installer App and Installer Platform, Enphase University and other training and certification programs, the Enphase Installer Network, installer documentation, and technical and service support. Enphase publicly describes its training resources as providing installers with information needed to design, install, and commission Enphase Energy Systems. Enphase further describes the Enphase Installer Network as its trusted network of installers and states that network partners are selected based on customer feedback, product certification, and commitment to Enphase products. *See* https://enphase.com/installers/training-and-certifications; *see also* https://enphase.com/installers/resources/ein.

107. Enphase publishes objective requirements for participation and tier status within the Enphase Installer Network. Those requirements include an installer's share and duration of Enphase installations, product certification or authorization, a minimum number of Enphase system activations per year, and, for specified tiers, homeowner-satisfaction thresholds. Enphase ties participation and tier status under those requirements to tangible benefits, including online and co-branded promotion, priority access to and allocation of Enphase products, access to Enphase personnel, and tiered discounts through Enphase's Labor Protection Program. *See* https://enphase.com/installers/resources/ein. Enphase's current United States Limited Warranty separately requires timely product registration, subject to specified state-law exceptions; permits registration through the Enphase Installer Platform or Enphase application; and excludes defects or damage resulting from improper installation or use contrary to Enphase's manuals. *See* https://enphase.com/download/wrty-00136united-states-eniq-microinverter0pdf §§ 2, 7(d).

108. On information and belief, Enphase maintains and uses records concerning installers' product certifications, system activations, Enphase product share, and customer feedback to determine Installer Network eligibility, tier status, and associated benefits. Those records and determinations are uniquely within Enphase's possession and control. Enphase establishes the manner and sequence of the relevant installation, configuration, commissioning, registration, and activation conduct through the instructions and technological workflows alleged above. Enphase benefits from that conduct because completed installations and activations enable the intended operation, monitoring, warranty support, and continued use of the Accused Products, expand Enphase's installed base, and support Enphase's associated products and services.

109. With respect to asserted method claims, to the extent Enphase conditions a third-party installer's participation in an activity or receipt of an associated benefit upon the installer's

performance of a claimed step and establishes the manner or timing of that performance, Tigo alleges that the installer's performance is attributable to Enphase. Tigo separately alleges direct infringement by installers and customers that make or put complete claimed systems into service and Enphase's inducement of those acts. To the extent discovery establishes that Enphase directs or controls the use of an entire claimed system, acts through an agent, or contracts for relevant assembly, commissioning, or operational conduct, Tigo pleads those direct-liability theories in the alternative.

### G. Enphase Had Actual Notice of the Tigo Patents

110. Enphase had actual notice of Tigo's patent rights, including certain Tigo Patents, before this action was filed. Enphase was a member of the SunSpec Alliance no later than 2015 and participated directly in the workgroup that developed the SunSpec RSD Specification. *See, e.g.*, https://sunspec.org/sunspec-alliance-receives-california-grant-study-deploy-communication-standards-smart-solar-plus-storage/. The SunSpec RSD Specification identifies Enphase among the companies participating in the SunSpec Alliance Communication Signal for Rapid Shutdown Workgroup. *See, e.g.*, https://sunspec.org/wp-content/uploads/2019/09/SunSpecRapidShutdownTestSpecificationRev10-APPROVED.pdf.

111. On October 30, 2017, TE notified SunSpec that TE held patents covering technologies relevant to rapid shutdown. A SunSpec Member's Briefing dated November 1, 2017, identified claims of five patents asserted in this action, the '172, '218, '612, '139, and '036 Patents, in connection with the SunSpec RSD Specification. *See* https://sunspec.org/wp-content/uploads/2019/08/SunSpecRapidShutdownBriefing20171101.pdf.

112. On information and belief, through its SunSpec membership, its direct participation in the SunSpec rapid-shutdown workgroup, and the associated member communications, Enphase received, reviewed, or otherwise learned of the November 1, 2017 Member's Briefing and TE's

patent-specific disclosures. Those disclosures identified the patents in the technical context of rapid-shutdown and related module-level communication and control technologies, the same general field in which Enphase develops and markets the Accused Products.

113. On January 2, 2026, Tigo sent Enphase a letter concerning Tigo's patent portfolio. The enclosed patent list expressly identified each of the ten Tigo Patents asserted in this action, and Tigo invited Enphase to discuss Tigo's patent rights and their applicability to Enphase products. *See* Ex. 11.

114. On February 2, 2026, Enphase responded to Tigo's letter and expressly acknowledged that the letter concerned Tigo's patent portfolio. Enphase stated that it had no interest in obtaining a license. *See* Ex. 12.

115. By no later than February 2, 2026, Enphase had actual knowledge of the existence of each Tigo Patent asserted in this action. Enphase had actual knowledge of Tigo's allegations that the Accused Products infringe those patents no later than the filing and service of this Complaint.

116. Despite this patent-specific notice, Enphase continued to make, use, test, demonstrate, sell, offer to sell, import, support, and/or supply the Accused Products without authorization from TE or Tigo.

117. On information and belief, Enphase's continued infringement after acquiring knowledge of the Tigo Patents was deliberate and intentional. Enphase knowingly chose to continue its accused activities without modifying the Accused Products to avoid infringement.

118. Enphase's deliberate conduct is further supported by its sophistication in the photovoltaic industry, its familiarity with rapid-shutdown and related photovoltaic-system

technologies, and its continued commercialization of the Accused Products after receiving patent-specific notice.

119. Enphase has therefore willfully infringed and continues to willfully infringe the Tigo Patents, as further alleged below. Tigo accordingly seeks enhanced damages under 35 U.S.C. § 284 for Enphase's deliberate and intentional infringement, including infringement occurring after Enphase acquired actual knowledge of each Tigo Patent.

## JURISDICTION AND VENUE

120. Plaintiff Tigo Energy Innovations LLC is a limited liability company organized and existing under the laws of the State of Texas, with its offices located at 316 W. 12th Street, 4th Floor, Austin, Texas 78701.

121. Defendant Enphase Energy, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its executive offices located at 47281 Bayside Parkway, Fremont, California 94538. Enphase describes itself as a global energy technology company that designs, develops, manufactures, and sells solar, battery, and energy-management solutions, including IQ Microinverters, IQ Gateways, IQ Combiners, communications and control products, and related firmware, software and system components.

122. This Court has original and exclusive jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

123. This Court has personal jurisdiction over Enphase consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas long-arm statute.

124. Enphase has purposefully directed activities toward this District, established and maintained a physical research-and-development facility in this District, conducted research, development, testing, and commercialization activities in this District, and sold and offered for sale products, including the Accused Products, to customers in this District. Enphase has therefore

purposefully availed itself of the privileges and benefits of conducting business in this District, and the exercise of personal jurisdiction is consistent with traditional notions of fair play and substantial justice.

125. Enphase has a place of business located within this District at 1835 Kramer Ln., Building B, Suite 125, Austin, Texas 78758 ("Austin Facility"), which includes offices and a laboratory for research and product development. A virtual tour of the Austin Facility is available online at: https://www.linkedin.com/posts/enphase-energy_enphase-take-a-tour-of-our-austin-offices-activity-7235305655815876608-Aep6/. Enphase has advertised various engineering positions based at its Austin Facility, including a Power Control Engineer focused on developing control algorithms for distributed energy systems including solar microinverters, battery storage, and grid-tied applications. Enphase has also advertised Austin-based engineering positions involving next-generation energy system hardware, embedded and power hardware integration, power electronics, communications devices, hardware-in-the-loop testing, prototype testing, distributed energy systems, grid integration standards, and power electronics system integration and modeling.

126. Upon information and belief, Enphase designs, uses, and/or tests its microinverter products and related products or technologies at the Austin Facility, including Enphase microinverters and associated equipment used to provide energy to the Austin Facility. At minimum, Enphase's Austin Facility is involved in research, development, design, validation, testing, prototyping, modeling, integration, and/or support of Enphase energy-system technologies related to the Accused Products.

127. Enphase, therefore, maintains a physical place of business, the Austin Facility, in this District. The Austin Facility is a regular and established place of business of Enphase in this District.

128. On information and belief, Enphase conducts business with and through at least 13 installers and distribution partners that sell and install the Accused Products in this District. Enphase has publicly identified those entities as Enphase installers serving customers in Texas, including the Midland and Odessa areas. Those installers sell, install, connect, configure, provision, commission, test, service, and/or support Enphase solar energy systems, including systems using the Accused Products, for customers in this District.

129. Publicly available user reports posted on Enphase's support platform describe installed and operating Enphase systems in Midland and Odessa, including systems in Midland using IQ7+ Microinverters. Publicly available information separately identifies solar installers located in or serving Midland and Odessa that offer systems using Enphase inverters (including PAIC Solar, Infinity Solar Solutions, and TriSMART Solar). Enphase provides installers, customers, and end users in the Division with installation and commissioning tools, monitoring services, firmware and software updates, warranty services, and technical support and derives revenue and other commercial benefits from the sale, installation, and continuing operation of those systems.

130. As set forth above, Enphase has directly and/or through intermediaries made, used, offered for sale, sold, and imported infringing products within this District, including within the Midland/Odessa Division. Enphase has also directed, instructed, encouraged, and assisted installers and customers in this District in installing, configuring, commissioning, testing, operating, and using the Accused Products and complete Enphase systems. Those infringing

products include, without limitation, Enphase IQ Series Microinverters, IQ Gateways, IQ Combiners, IQ Cables, Enphase monitoring and management software, grid-profile and control functionality, and related Enphase system components configured and operated with photovoltaic modules.

131. Enphase maintains established distribution channels that deliver Accused Products into this District. Enphase publicly states that its business strategy is to deliver Enphase home energy systems to homeowners through its installer and distribution partners, enabled by Enphase's comprehensive digital platform. *See* https://enphase.com/homeowners/enphase-installer-network.

132. Enphase markets, promotes, sells, and supports the Accused Products to customers in this District, including through interactive websites, sales representatives, third-party installers (such as Lighthouse Solar and Greenbelt Solar), and promotional activities. Enphase also provides installation guides, technical documentation, training and certification resources, installer software, the Enphase Installer App and Installer Platform, commissioning tools, monitoring services, firmware and software updates, technical support, and other materials used by installers and customers in this District to install, configure, commission, operate, test, and support the Accused Products.

133. Furthermore, Enphase also maintains ongoing commercial relationships with customers, distributors, and installers located in this District.

134. Tigo's claims arise directly from Enphase's acts of infringement in this District, including Enphase's sale and offer for sale of Accused Products and, on information and belief, Enphase's making, using, testing, and demonstration of Accused Products and complete Enphase systems in this District.

135. The exercise of personal jurisdiction over Enphase is reasonable and does not offend traditional notions of fair play and substantial justice, as Enphase has derived substantial benefit from its activities in this District.

136. Venue is proper in this District under 28 U.S.C. § 1400(b) because Enphase has committed acts of infringement in this District and maintains a regular and established place of business in this District, including the Austin Facility. Venue is also proper because Enphase has sold, offered for sale, used, tested, demonstrated, supported, and/or otherwise commercialized the Accused Products in this District, directly and/or through distributors, installers, customers, and other intermediaries.

137. On information and belief, Enphase has placed, and continues to place, Accused Products into the stream of commerce with the knowledge and intent that those products will be sold, offered for sale, installed, configured, commissioned, used, and supported in this District.

## COUNT ONE
## INFRINGEMENT OF U.S. PATENT NO. 8,102,074

138. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

139. Pursuant to 35 U.S.C. § 282, the claims of the ’074 Patent are presumed valid.

140. In view of the foregoing facts and allegations, including paragraphs 73–89 above, Enphase has infringed and continues to infringe one or more claims of the ’074 Patent, including but not limited to exemplary claim 16, pursuant to 35 U.S.C. § 271. Enphase directly infringes by using, testing, demonstrating, commissioning, and/or operating installed multi-module Enphase IQ systems in a manner that practices the claimed methods and by making, assembling, using, testing, demonstrating, commissioning, and/or operating complete Enphase IQ systems that meet

the asserted system claims. Enphase also induces and/or contributes to infringement by others as alleged below.

141. Claim 16 of the '074 Patent recites:

> **16**. A method comprising:
>
> monitoring a first voltage across a first string bus section connecting a first solar module to a second solar module;
>
> monitoring a second voltage across a second string bus section connecting the second solar module to a voltage output; and
>
> limiting the voltage output based on a maximum regulatory safety voltage by limiting at least one of a voltage of the first solar module and a voltage of the second solar module.

142. Enphase has directly infringed and continues to directly infringe one or more claims of the '074 Patent in violation of 35 U.S.C. § 271(a). With respect to method claims, including claims 16 and 17, Enphase directly infringes by using, testing, demonstrating, commissioning, and/or operating installed Enphase IQ systems in a manner that performs the claimed methods. With respect to system claims, including claims 1, 2, and 7, Enphase directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating complete Enphase IQ systems containing multiple PV modules, IQ Microinverters, IQ Cable or other AC branch-circuit components, IQ Gateways, and related Enphase system components. On information and belief, Enphase also directly infringes through activities involving complete AC Modules that incorporate an Enphase microinverter with a PV module.

143. Enphase's infringement is shown by way of an exemplary multi-module Enphase IQ system containing IQ Series Microinverters, IQ Cable, an IQ Gateway, and corresponding PV modules, as set forth in paragraphs 73–89 above. Those allegations demonstrate infringement of at least claim 16 of the '074 Patent by showing:

a. A first PV module and a second PV module are each connected through

a corresponding IQ Microinverter to connectors positioned along a continuous IQ Cable or AC branch circuit. The IQ Cable and associated AC branch circuit map to the claimed string bus. In an exemplary end-fed branch circuit, the portion of the IQ Cable between the first and second PV-module and microinverter connection points maps to the first string bus section, while the portion extending from the second connection point toward the junction box, IQ Combiner, subpanel, or point of common coupling maps to the second string bus section and leads to the claimed voltage output;

b. Each IQ Microinverter senses voltage from the AC grid at its AC output terminal. Enphase's voltage-rise materials identify the microinverter AC output as the voltage-measurement reference point and explain that voltage measured at successive microinverters varies based on each microinverter's position along the IQ Cable branch circuit and the current added by other microinverters. The voltage measurements made at the first and second IQ Microinverters therefore monitor the respective voltages across the first and second IQ Cable or AC branch-circuit sections; and

c. The IQ Microinverters limit voltage output based on applicable regulatory and safety voltage limits. Each IQ Microinverter individually controls its associated PV module through its power-conversion circuitry and maximum power point tracking functionality. Enphase states that its microinverters verify that grid voltage is within applicable IEEE 1547 limits and automatically cease producing or exporting power when voltage falls outside predetermined operating limits, including the applicable upper-voltage

limit. By ceasing or limiting production from the corresponding PV module, the IQ Microinverter limits the system voltage output by limiting the voltage associated with at least one of the first and second PV modules. Additionally or alternatively, Enphase's rapid-shutdown functionality limits module-level voltage based on the regulatory safety-voltage requirements of National Electrical Code section 690.12 by causing each IQ Microinverter to stop converting DC to AC and cut off voltage at the module level when rapid shutdown is activated. These structural and functional relationships satisfy the limitations of claim 16 either literally or under the doctrine of equivalents.

144. Installers, customers, and end users also directly infringe one or more claims of the '074 Patent. Installers directly infringe the asserted system claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and putting into service complete multi-module Enphase IQ systems containing the claimed PV modules, string-bus sections, controller, and local management units. Installers, customers, and end users directly infringe the asserted method claims, including exemplary claim 16, by commissioning, activating, testing, and/or operating those systems in a manner that causes the claimed first- and second-voltage monitoring and voltage-limiting steps to be performed. Customers and end users further directly infringe the asserted system claims by putting the complete systems into service, controlling their operation, and obtaining the benefit of the electrical power, voltage-control, and safety functionality produced by those systems.

145. The foregoing acts of installers and other third parties are attributable to Enphase for purposes of direct infringement. Enphase directs and controls the manner in which complete Enphase IQ systems are installed, connected, configured, provisioned, commissioned, activated,

monitored, and operated through the design of the Accused Products, Enphase installation manuals and quick-install guides, IQ Cable branch-circuit specifications and limits, grid-profile and voltage-protection requirements, the Enphase Installer App and Installer Platform, provisioning and commissioning tools, installer training and certification resources, and Enphase technical support. Enphase benefits from those acts because the resulting installation and commissioning enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of Enphase products and services. Accordingly, Enphase is responsible for those acts under principles of direction and control, agency, and vicarious liability, including with respect to making and using complete systems and performing the claimed methods.

146. Enphase had actual knowledge of the existence of the ’074 Patent no later than February 2, 2026. Tigo’s January 2, 2026 letter expressly identified the ’074 Patent, and Enphase’s February 2, 2026 response acknowledged Tigo’s patent portfolio. Enphase had actual knowledge of Tigo’s specific allegations that the Accused Products infringe the ’074 Patent no later than the filing and service of this Complaint.

147. After acquiring knowledge of the ’074 Patent and, no later than the filing and service of this Complaint, Tigo’s specific infringement allegations, Enphase has indirectly infringed and continues to indirectly infringe one or more claims of the ’074 Patent, including but not limited to exemplary claim 16, by active inducement pursuant to 35 U.S.C. § 271(b). Enphase has intentionally instructed, encouraged, and assisted installers, customers, and end users to directly infringe by, among other things: (1) selling, offering for sale, and/or importing the Accused Products for installation and operation in multi-module Enphase IQ systems that infringe the ’074 Patent either literally or under the doctrine of equivalents; (2) marketing the voltage-

monitoring, grid-protection, AC Voltage Out-of-Range, IEEE 1547-compliance, and rapid-shutdown capabilities of the Accused Products; and (3) providing installation manuals, quick-install guides, IQ Cable branch-circuit specifications, technical documentation, grid-profile requirements, the Enphase Installer App and Installer Platform, commissioning tools, training, certification resources, technical support, and other assistance directing the infringing installation, configuration, commissioning, testing, and operation of the Accused Products. On information and belief, Enphase has continued these affirmative acts with the specific intent that the induced acts be performed and with knowledge that those acts constitute infringement of the ’074 Patent.

148. Enphase has also indirectly infringed and continues to indirectly infringe one or more claims of the ’074 Patent by contributory infringement pursuant to 35 U.S.C. § 271(c). Enphase manufactures, sells, offers to sell, and/or imports IQ Microinverters, IQ Cable components, IQ Gateways, embedded voltage-monitoring and protection software, and related Accused Products that constitute material parts of the claimed systems and material apparatuses for use in practicing the claimed methods. Those components and configurations are especially made and/or especially adapted for installation and operation in multi-module Enphase IQ systems providing the claimed voltage-monitoring and voltage-limiting functionality. When configured and supplied for that functionality, they are not staple articles or commodities of commerce suitable for substantial noninfringing use and are known by Enphase to be especially made or adapted for use in infringement of the ’074 Patent. Enphase’s affirmative acts contribute to installers, customers, and end users directly infringing the ’074 Patent with the Accused Products.

149. Tigo has suffered and continues to suffer damages as a result of Enphase’s infringement of the ’074 Patent in an amount to be determined at trial.

150. Tigo has suffered and will continue to suffer irreparable harm unless Enphase's infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for Enphase's infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT TWO
## INFRINGEMENT OF U.S. PATENT NO. 8,274,172

151. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

152. Pursuant to 35 U.S.C. § 282, the claims of the '172 Patent are presumed valid.

153. In view of the foregoing facts and allegations, including paragraphs 73–85 above, Enphase has infringed and continues to infringe one or more claims of the '172 Patent, including but not limited to exemplary claim 17, pursuant to 35 U.S.C. § 271. Enphase directly infringes by using, testing, demonstrating, commissioning, and/or operating installed Accused Products in a manner that practices the claimed methods and by making, using, testing, demonstrating, selling, offering to sell, and/or importing complete Enphase IQ systems incorporating the Accused Products and PV modules that meet the asserted system claims. Enphase also induces and/or contributes to infringement by others.

154. Claim 17 of the '172 Patent recites:

> **17**. A method comprising:
>
> monitoring a voltage across a string bus section connecting a solar module to a voltage output; and
>
> limiting the voltage output based on a maximum regulatory safety voltage by limiting a voltage of the solar module.

155. Enphase has directly infringed and continues to directly infringe one or more claims of the ’172 Patent in violation of 35 U.S.C. § 271(a). With respect to method claims, including exemplary claim 17, Enphase directly infringes by using, testing, demonstrating, commissioning, and/or operating installed Accused Products in a manner that performs the claimed methods. With respect to system claims, including claims 1 and 9, Enphase directly infringes by making, using, testing, demonstrating, selling, offering to sell, and/or importing complete Enphase IQ systems incorporating the Accused Products and PV modules, including, on information and belief, AC modules incorporating Enphase microinverters.

156. Enphase’s infringement is shown by way of the IQ Series Microinverters, such as the IQ7, configured and operated with a PV module, IQ Cable or other AC branch-circuit components, and related Enphase system components, as set forth in paragraphs 73–85 above. Those allegations demonstrate infringement of at least claim 17 of the ’172 Patent by showing:

a. The IQ Series Microinverter monitors voltage at its AC output and across an IQ Cable or AC branch-circuit section that connects a PV module, through its corresponding microinverter, to the system voltage output; and

b. The IQ Series Microinverter limits voltage output based on a maximum regulatory safety voltage by sensing voltage conditions and ceasing power production, ceasing export, and/or otherwise limiting output when measured voltage falls outside applicable regulatory and safety limits, including IEEE 1547 voltage limits and the associated AC Voltage Out-of-Range condition. Additionally or alternatively, the IQ Series Microinverters limit voltage output based on the regulatory safety-voltage requirements of National Electrical Code section 690.12 by stopping DC-to-AC conversion and cutting off voltage at the

module level upon activation of rapid shutdown.

157. Installers, customers, and end users also directly infringe one or more claims of the ’172 Patent. Installers directly infringe the asserted system claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and putting into service complete Enphase IQ systems that include the Accused Products and PV modules. Installers, customers, and end users directly infringe the asserted method claims, including exemplary claim 17, by commissioning, activating, testing, and/or operating those systems in a manner that causes the claimed voltage-monitoring and voltage-limiting steps to be performed. Customers and end users further directly infringe the asserted system claims by putting the complete systems into service, controlling their operation, and obtaining the benefit of the electrical power and related functionality produced by the systems.

158. The foregoing acts of installers and other third parties are attributable to Enphase for purposes of direct infringement. Enphase directs and controls the manner in which complete Enphase IQ systems are installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, Enphase installation manuals and quick-install guides, Enphase technical requirements, the Enphase Installer App and Installer Platform, Enphase provisioning and commissioning tools, Enphase installer training and certification resources, and Enphase technical support. Enphase benefits from those acts because the resulting installation and commissioning of complete Enphase IQ systems enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of Enphase products and services. Accordingly, Enphase is responsible for those acts under principles of direction and control, agency, and vicarious liability, including with respect to the making and use of complete systems and performing the claimed methods.

159. On information and belief, Enphase has had actual knowledge of the existence of the ’172 Patent since at least November 1, 2017. A SunSpec Member’s Briefing issued that day identified claims 1, 9, and 17 of the ’172 Patent in connection with the SunSpec RSD Specification, and Enphase received, reviewed, or otherwise learned of that patent-specific disclosure through its SunSpec membership and participation in the rapid-shutdown workgroup. Enphase had actual knowledge of Tigo’s specific allegations that the Accused Products infringe the ’172 Patent no later than the filing and service of this Complaint.

160. By continuing to make, use, test, demonstrate, sell, offer to sell, and/or import the Accused Products after acquiring knowledge of the ’172 Patent, Enphase has indirectly infringed and continues to indirectly infringe one or more claims of the ’172 Patent, including but not limited to exemplary claim 17, by active inducement pursuant to 35 U.S.C. § 271(b). Enphase has intentionally instructed, encouraged, and assisted installers, customers, and end users to directly infringe by, among other things: (1) selling, offering for sale, and/or importing Accused Products that, when installed, configured, commissioned, and operated as Enphase markets and intends, infringe the ’172 Patent either literally or under the doctrine of equivalents; (2) marketing the voltage-monitoring, voltage-control, grid-protection, and rapid-shutdown capabilities of the Accused Products; and (3) providing installation manuals, quick-install guides, technical documentation, grid-profile requirements, the Enphase Installer App and Installer Platform, commissioning tools, training, certification resources, technical support, and other assistance directing the infringing installation, configuration, commissioning, testing, and operation of the Accused Products. On information and belief, Enphase has performed and continues to perform these affirmative acts with the specific intent that the induced acts be performed and with knowledge that those acts constitute infringement of the ’172 Patent.

161. Enphase has also indirectly infringed and continues to indirectly infringe one or more claims of the ’172 Patent by contributory infringement pursuant to 35 U.S.C. § 271(c). Enphase manufactures, sells, offers to sell, and/or imports IQ Series Microinverters and related Accused Products that constitute material parts of the claimed systems and apparatuses for use in practicing the claimed methods. The Accused Products are especially made and/or especially adapted for use in infringement of the ’172 Patent, are not staple articles or commodities of commerce suitable for substantial noninfringing use when installed, configured, commissioned, and operated with the voltage-monitoring, voltage-limiting, and rapid-shutdown functionality that Enphase designs, enables, markets, and instructs, and are known by Enphase to be so made and adapted. Enphase’s affirmative acts contribute to installers, customers, and end users directly infringing the ’172 Patent with the Accused Products. On information and belief, Enphase has performed and continues to perform these acts with knowledge that the Accused Products are especially made or adapted for use in infringement of the ’172 Patent.

162. Tigo has suffered and continues to suffer damages as a result of Enphase’s infringement of the ’172 Patent in an amount to be determined at trial.

163. Tigo has suffered and will continue to suffer irreparable harm unless Enphase’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for Enphase’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT THREE
## INFRINGEMENT OF U.S. PATENT NO. 8,823,218

164. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

165. Pursuant to 35 U.S.C. § 282, the claims of the '218 Patent are presumed valid.

166. In view of the foregoing facts and allegations, including paragraphs 96–99 above, Enphase has infringed and continues to infringe one or more claims of the '218 Patent, including but not limited to exemplary claim 15, pursuant to 35 U.S.C. § 271. Enphase directly infringes by using, testing, demonstrating, configuring, commissioning, and/or operating Power Control-enabled Enphase Energy Systems in a manner that practices the claimed methods and by making, assembling, using, testing, demonstrating, commissioning, and/or operating complete Power Control-enabled Enphase Energy Systems that meet the asserted system claims. Enphase also induces and/or contributes to infringement by others.

167. Claim 15 of the '218 Patent recites:

> **15**. A method comprising:
>
> monitoring a sensor for an anomaly by a master control unit (MMU);
>
> determining by the MMU if the sensor has detected an anomaly and, if the sensor has detected an anomaly, the MMU determining if the anomaly requires a control change; and
>
> issuing a control change command to a local management unit if the anomaly requires a control change, wherein the control change command is selected from the group consisting of:
>
> > a command to shut down one or more solar modules;
> >
> > a command to disconnect one or more solar modules;
> >
> > a command to shut down one or more solar module strings;
> >
> > a command to alter the output of a solar module;
> >
> > a command to shutdown one or more LMUs;
> >
> > a command to disconnect one or more LMUs;
> >
> > a command to shutdown an inverter;
> >
> > a command to disconnect an inverter;

a command to do nothing; and

no command.

168. Enphase has directly infringed and continues to directly infringe one or more claims of the ’218 Patent in violation of 35 U.S.C. § 271(a). With respect to method claims, including claims 15–17, Enphase directly infringes by using, testing, demonstrating, configuring, commissioning, and/or operating Power Control-enabled Enphase Energy Systems in a manner that performs the claimed methods. With respect to system claims, including claims 1–5, Enphase directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating complete Power Control-enabled Enphase Energy Systems, including, on information and belief, through research, development, validation, testing, demonstration, training, and technical-support activities conducted at Enphase facilities.

169. For purposes of this Count, Power Control-enabled Enphase Energy Systems include installed Enphase systems configured to perform Enphase Power Control functions, including main-panel-upgrade avoidance with busbar-overload control or feeder control. Such systems include one or more IQ Microinverters with grid-forming technology, an IQ Gateway with power-control-system controller functionality, and Production CTs, Battery CTs, Consumption CTs, and/or an IQ Meter Collar. Enphase’s infringement is shown by way of those systems, as set forth in paragraphs 96–99 above, which demonstrate infringement of at least claim 15 of the ’218 Patent by showing:

a. The IQ Gateway, including an IQ Gateway integrated into an IQ Combiner, maps to the claimed master control unit. The IQ Gateway monitors current reported by the Production CTs, Battery CTs, Consumption CTs and/or IQ Meter Collar and uses that information to control PV and energy-storage-system power production;

b. The Production CTs, Battery CTs, Consumption CTs and/or IQ Meter Collar map to the claimed sensors. Those sensors monitor and report production, consumption, export, and/or backfeed current conditions to the IQ Gateway. One example of the claimed anomaly is a detected current, export, or backfeed condition that exceeds an applicable limit, including a feeder-current limit, busbar-ampacity limit, or other electrical-system limit;

c. The IQ Gateway determines whether the current condition detected and reported through the sensors exceeds the applicable limit and, if so, determines that the anomaly requires a control change. For example, Enphase's Power Control materials describe a configuration in which the IQ Gateway determines whether current being backfed to the main panel has increased beyond a configured 32-ampere limit;

d. When the monitored current exceeds the applicable limit, the IQ Gateway sends an affirmative signal to the IQ Microinverters directing them to limit production. That signal maps to the claimed control change command sent to a local management unit; and

e. The IQ Microinverters map to the claimed local management units because each IQ Microinverter communicates with the IQ Gateway and individually controls an associated PV module, including through maximum power point tracking. In response to the IQ Gateway's control signal, the IQ Microinverters limit production from their associated PV modules. The Gateway's signal therefore satisfies at least the expressly claimed alternative of "a command to alter the output of a solar module."

170. Installers, customers, and end users also directly infringe one or more claims of the ’218 Patent. Installers directly infringe the asserted system claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and putting into service complete Power Control-enabled Enphase Energy Systems containing the claimed gateway, sensor, microinverter, software, and PV-module architecture. Installers, customers, and end users directly infringe the asserted method claims, including exemplary claim 15, by configuring, commissioning, activating, testing, and/or operating those systems in a manner that causes the claimed sensor-monitoring, anomaly-determination, control-change determination, and command-issuance steps to be performed. Customers and end users further directly infringe the asserted system claims by putting the complete systems into service, controlling their operation, and obtaining the benefit of the electrical power, power-control, and related functionality produced by the systems.

171. The foregoing acts of installers and other third parties are attributable to Enphase for purposes of direct infringement. Enphase directs and controls the manner in which Power Control-enabled Enphase Energy Systems are designed, installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, Enphase Power Control requirements and technical materials, Enphase installation manuals and quick-install guides, the Enphase Installer App and Installer Platform, Enphase provisioning and commissioning tools, Enphase installer training and certification resources, and Enphase technical support. Enphase benefits from those acts because the resulting installation and commissioning enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of Enphase products and services. Accordingly, Enphase is responsible for those acts under principles of direction and control, agency, and

vicarious liability, including with respect to making and using complete systems and performing the claimed methods.

172. On information and belief, Enphase has had actual knowledge of the existence of the ’218 Patent since at least November 1, 2017. A SunSpec Member’s Briefing issued that day identified claims 1, 15, and 18 of the ’218 Patent in connection with the SunSpec RSD Specification, and Enphase received, reviewed, or otherwise learned of that patent-specific disclosure through its SunSpec membership and participation in the rapid-shutdown workgroup. Enphase had actual knowledge of Tigo’s specific allegations that the Accused Products infringe the ’218 Patent no later than the filing and service of this Complaint.

173. By continuing to make, use, test, demonstrate, sell, offer to sell, and/or import the Accused Products after acquiring knowledge of the ’218 Patent, Enphase has indirectly infringed and continues to indirectly infringe one or more claims of the ’218 Patent, including but not limited to exemplary claim 15, by active inducement pursuant to 35 U.S.C. § 271(b). Enphase has intentionally instructed, encouraged, and assisted installers, customers, and end users to directly infringe by, among other things: (1) selling, offering for sale, and/or importing the Accused Products for installation and operation in Power Control-enabled systems that infringe the ’218 Patent either literally or under the doctrine of equivalents; (2) marketing Power Control functionality, including main-panel-upgrade avoidance with busbar-overload and feeder control; and (3) providing Power Control technical materials, installation manuals, quick-install guides, the Enphase Installer App and Installer Platform, commissioning tools, training, certification resources, technical support, and other assistance directing the installation of current sensors, configuration of applicable limits, commissioning of the systems, and operation of the Gateway-to-microinverter control sequence. On information and belief, Enphase has performed and

continues to perform these affirmative acts with the specific intent that the induced acts be performed and with knowledge that those acts constitute infringement of the ’218 Patent.

174. Enphase has also indirectly infringed and continues to indirectly infringe one or more claims of the ’218 Patent by contributory infringement pursuant to 35 U.S.C. § 271(c). Enphase manufactures, sells, offers to sell, and/or imports IQ Gateways and IQ Combiners configured with Power Control software, current-sensing products, IQ Microinverters, and related Accused Products that constitute material parts of the claimed systems and material apparatuses for use in practicing the claimed methods. The Power Control software, configurations, and associated components supplied by Enphase are especially made and/or especially adapted to perform the claimed sensor-monitoring and responsive-control functionality. When enabled and configured to perform that functionality, they are not staple articles or commodities of commerce suitable for substantial noninfringing use and are known by Enphase to be especially made or adapted for use in infringement of the ’218 Patent. Enphase’s affirmative acts contribute to installers, customers, and end users directly infringing the ’218 Patent with the Accused Products.

175. Tigo has suffered and continues to suffer damages as a result of Enphase’s infringement of the ’218 Patent in an amount to be determined at trial.

176. Tigo has suffered and will continue to suffer irreparable harm unless Enphase’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for Enphase’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT FOUR

**INFRINGEMENT OF U.S. PATENT NO. 8,860,241**

177. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

178. Pursuant to 35 U.S.C. § 282, the claims of the ’241 Patent are presumed valid.

179. In view of the foregoing facts and allegations, including paragraphs 74–89 above, Enphase has infringed and continues to infringe one or more claims of the ’241 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271. Enphase directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating complete multi-module Enphase IQ systems and AC Module configurations containing the claimed module-level power-conversion and power-line-communication architecture. Enphase also induces and/or contributes to infringement by supplying Accused Products for incorporation into and use in infringing apparatuses as alleged below.

180. Claim 1 of the ’241 Patent recites:

> **1**. An apparatus, comprising:
>
> a photovoltaic energy production unit to generate electricity; and
>
> a local management unit, coupled between the photovoltaic energy production unit and a connection of energy production units forming a string bus, the local management unit having:
>
> > a controller,
> >
> > a voltage converter having switching circuitry, and
> >
> > a communication transmission modulator;
>
> wherein the controller provides a control for the switching circuitry to cause the voltage converter to deliver electrical energy generated by the photovoltaic energy production unit to the string bus; and
>
> wherein the communication transmission modulator modulates the control, provided by the controller to the switching circuitry of the voltage converter, with data to be transmitted from the local management unit over the string bus.

181. Enphase has directly infringed and continues to directly infringe at least claim 1 of the ’241 Patent in violation of 35 U.S.C. § 271(a). Enphase directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating complete Enphase IQ systems containing PV modules, IQ7 and/or IQ8 Series Microinverters, IQ Cable or other AC branch-circuit components, and associated power-line-communication functionality. On information and belief, Enphase undertakes such activities through research, development, validation, testing, demonstrations, installer training, commissioning, technical support, and troubleshooting involving complete systems. Enphase also directly infringes through its activities involving AC Modules that combine Enphase microinverters with corresponding PV modules.

182. Enphase’s infringement is shown by way of exemplary multi-module Enphase IQ systems containing IQ8 Series Microinverters, IQ Cable, and corresponding PV modules, as set forth in paragraphs 74–89 above. Those allegations demonstrate infringement of at least claim 1 of the ’241 Patent by showing:

a. Each accused system contains PV modules that generate DC electricity and map to the claimed photovoltaic energy production units;

b. Each IQ Microinverter maps to a claimed local management unit. Enphase instructs that each microinverter be connected between a corresponding PV module and a connector on the IQ Cable. The outputs of multiple PV-module and microinverter energy-production units are connected through the continuous IQ Cable or associated AC branch circuit. That common multi-unit connection maps to the claimed “connection of energy production units forming a string bus.” The accused string bus is the IQ Cable or common AC branch circuit itself, rather than the IQ Gateway or IQ Combiner;

c. Each IQ Microinverter contains a controller, voltage-conversion circuitry containing switching components, and a power-line-communication controller or modulator. The IQ Microinverters include, among other components, a purpose-built SWIFT controller, MOSFET switching circuitry forming the power-conversion stage, and a PLC communications microcontroller that maps to the claimed communication transmission modulator;

d. The microinverter controller controls the MOSFET switching circuitry to cause the voltage converter to convert DC electricity from the corresponding PV module into grid-compliant AC electricity and deliver that electricity to the IQ Cable or AC branch circuit;

e. On information and belief, the PLC communications controller or modulator modulates the control supplied to the power-stage switching circuitry with production, performance, status, identification, and/or other data transmitted from the IQ Microinverter over the IQ Cable or AC branch circuit. Enphase expressly states that the IQ Gateway collects production and performance data "from the Enphase IQ Microinverters over on-site AC power lines." That statement confirms both that the transmitted data originates from the claimed local management units and that the data travels over the same power conductors that receive the microinverters' electrical output; and

f. Accordingly, the IQ Cable or associated AC branch circuit both connects the multiple PV-module and microinverter energy-production units and carries the electrical energy and modulated data transmitted from the

individual IQ Microinverters, satisfying the claimed string-bus and data-transmission limitations either literally or under the doctrine of equivalents.

183. Installers, customers, and end users also directly infringe at least claim 1 of the '241 Patent. Installers directly infringe by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and putting into service complete Enphase IQ systems containing PV modules, IQ Microinverters, IQ Cable or other AC branch-circuit components, and the associated power-line-communication functionality. Through those activities, installers couple each IQ Microinverter between a corresponding PV module and the common IQ Cable branch and connect multiple energy-production units to form the claimed apparatus. Customers and end users further directly infringe by putting the complete systems into service, controlling their operation, and obtaining the benefit of the electrical-power-generation, monitoring, and power-line-communication functionality produced by those systems.

184. The foregoing acts of installers and other third parties are attributable to Enphase for purposes of direct infringement. Enphase directs and controls the manner in which complete Enphase IQ systems are assembled, installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, Enphase installation manuals and quick-install guides, IQ Cable branch-circuit specifications, the Enphase Installer App and Installer Platform, provisioning and commissioning tools, installer training and certification requirements, and Enphase technical support. Enphase benefits from those acts because the resulting assembly, installation, and commissioning enable the intended sale, activation, operation, monitoring, and support of the Accused Products and expand the installed base of Enphase products and services. Accordingly, Enphase is responsible for those acts under

principles of direction and control, agency, and vicarious liability, including with respect to making and using complete systems and performing the claimed methods.

185. Enphase had actual knowledge of the existence of the ’241 Patent no later than February 2, 2026. Tigo’s January 2, 2026 letter expressly identified the ’241 Patent, and Enphase’s February 2, 2026 response acknowledged Tigo’s patent portfolio. Enphase had actual knowledge of Tigo’s specific allegations that the Accused Products infringe the ’241 Patent no later than the filing and service of this Complaint.

186. After acquiring knowledge of the ’241 Patent and, no later than the filing and service of this Complaint, Tigo’s specific infringement allegations, Enphase has indirectly infringed and continues to indirectly infringe at least claim 1 of the ’241 Patent by active inducement pursuant to 35 U.S.C. § 271(b). Enphase has intentionally instructed, encouraged, and assisted installers, customers, and end users to directly infringe by, among other things: (1) selling, offering for sale, and/or importing IQ Microinverters and related products for incorporation into complete multi-module Enphase IQ systems that infringe the ’241 Patent either literally or under the doctrine of equivalents; (2) marketing the module-level power-conversion, monitoring, and power-line-communication capabilities of the Accused Products; and (3) providing installation manuals, quick-install guides, IQ Cable branch-circuit specifications, the Enphase Installer App and Installer Platform, commissioning tools, training, certification resources, technical support, and other assistance directing the infringing assembly, configuration, commissioning, and operation of the Accused Products. On information and belief, Enphase has continued these affirmative acts with the specific intent that the induced acts be performed and with knowledge that those acts constitute infringement of the ’241 Patent.

187. Enphase has also indirectly infringed and continues to indirectly infringe at least claim 1 of the ’241 Patent by contributory infringement pursuant to 35 U.S.C. § 271(c). Enphase manufactures, sells, offers to sell, and/or imports IQ Microinverters containing the claimed controller, switching circuitry, power-conversion circuitry, and power-line-communication functionality. Those components constitute material parts of the claimed apparatus and are especially made and/or especially adapted for connection between PV modules and IQ Cable branch circuits and for transmission of microinverter data over those power conductors. When supplied and configured to perform that functionality, the accused combinations are not staple articles or commodities of commerce suitable for substantial noninfringing use and are known by Enphase to be especially made or adapted for use in infringement of the ’241 Patent. Enphase’s affirmative acts contribute to installers, customers, and end users directly infringing the ’241 Patent.

188. Tigo has suffered and continues to suffer damages as a result of Enphase’s infringement of the ’241 Patent in an amount to be determined at trial.

189. Tigo has suffered and will continue to suffer irreparable harm unless Enphase’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for Enphase’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT FIVE
## INFRINGEMENT OF U.S. PATENT NO. 9,124,139

190. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

191. Pursuant to 35 U.S.C. § 282, the claims of the ’139 Patent are presumed valid.

192. In view of the foregoing facts and allegations, including paragraphs 86–95 above, Enphase has infringed and continues to infringe one or more claims of the ’139 Patent, including at least claims 1 and 16, with claim 1 plead as exemplary, pursuant to 35 U.S.C. § 271, at least by, without authority, making, using, selling, offering to sell, and/or importing IQ Gateways, IQ Combiners containing integrated Gateway functionality, and related Accused Products containing the claimed computer-readable instructions, processor, and memory, and by inducing and/or contributing to infringement by others.

193. Claim 1 of the ’139 Patent recites:

> **1**. A non-transitory computer-readable storage medium storing thereon computer readable instructions configured to instruct a master management unit to perform a method, the method comprising:
>
> receiving, by the master management unit from a first local management unit, an identification code of the first local management unit coupled with a solar module in a solar system having a plurality of solar modules and a plurality of local management units controlling the plurality of solar modules respective, including the first local management unit controlling the solar module, wherein the master management unit is configured to communicate with the local management units to control operations of the solar modules in the solar system; and
>
> in response to the receiving of the identification code, sending, by the master management unit, an authentication of the identification code, the authentication to cause the first local management unit to continue active operation of the solar module.

194. Enphase has directly infringed and continues to directly infringe at least claims 1 and 16 of the ’139 Patent in violation of 35 U.S.C. § 271(a). Enphase directly infringes by making, using, testing, demonstrating, selling, offering to sell, and/or importing IQ Gateways and IQ Combiners containing integrated Gateway functionality. Those products contain non-transitory computer-readable storage media storing Enphase firmware and software instructions configured to perform the claimed identification-and-authentication operations. They also constitute the claimed master management units because they contain one or more processors and memories

storing instructions configured to perform those same operations. On information and belief, Enphase also directly infringes through its own development, validation, testing, demonstration, installer-training, commissioning, technical-support, and troubleshooting activities involving complete systems containing IQ Gateways and IQ Microinverters.

195. Enphase's infringement is shown by way of exemplary Enphase systems containing IQ Gateways or IQ Combiners with integrated Gateway functionality, IQ8 Series Microinverters, corresponding PV modules, the Enphase Installer App and Installer Platform, and associated commissioning and power-line-communication functionality, as set forth in paragraphs 86–95 above. Those allegations demonstrate infringement of at least claim 1 of the '139 Patent by showing:

a. Each IQ Gateway contains one or more processors, memory, non-transitory computer-readable storage media, and Enphase firmware and software instructions. The stored instructions configure the IQ Gateway to discover, identify, validate, configure, monitor, and communicate with IQ Microinverters during system commissioning and operation;

b. Each IQ Microinverter maps to a claimed local management unit and is coupled with a corresponding PV module. Each microinverter controls the operation and power output of its corresponding module through its controller, power-conversion circuitry, and individual maximum power point tracking. A typical Enphase system contains multiple PV modules and corresponding IQ Microinverters controlled and monitored through a common IQ Gateway;

c. The IQ Gateway maps to the claimed master management unit. It communicates with IQ Microinverters over the installation's AC power lines

and controls aspects of their operation, including device commissioning, validation, activation, grid-profile configuration, production control, and system monitoring;

d. During Enphase's device-discovery and commissioning process, the IQ Gateway performs an Envoy or Gateway device-discovery scan through which it discovers and receives information identifying individual IQ Microinverters. Each microinverter has a unique serial number or corresponding coded device identifier that maps to the claimed identification code. Enphase's Installer App and Installer Platform display the serial numbers of the microinverters discovered by and communicating with the Gateway. Functional testing likewise identified coded communications between the Gateway and microinverters and showed the serial numbers of the microinverters paired with the Gateway;

e. On information and belief, in response to receiving an individual microinverter's identification code, the IQ Gateway performs device-specific commissioning and validation operations and sends an authentication of that identification code to the identified microinverter. The responsive communication includes one or more device-validation, pairing, activation, authorization, configuration, and/or grid-profile communications directed to the recognized microinverter. Enphase's commissioning workflow automatically validates IQ Microinverters, propagates grid profiles to detected microinverters, and permits an installer to confirm that each identified device has received the applicable profile and is communicating properly; and

f. The authentication causes or permits the identified IQ Microinverter to continue active operation of its corresponding PV module. Functional testing showed that IQ8 Series Microinverters required commissioning with an IQ Gateway before they would operate. After the microinverter is discovered, validated, commissioned, and provided the applicable grid profile, the Enphase Installer App identifies the microinverter as online, communicating, and producing power. The grid profile enables continuing operation by providing the operating parameters necessary for grid compliance and interoperability. Accordingly, the Gateway's responsive authentication permits the identified microinverter to enter and continue normal active operation of the corresponding PV module.

196. Enphase also directly infringes claim 16 through the same accused IQ Gateways and IQ Combiners containing integrated Gateway functionality. Each accused Gateway constitutes a master management unit comprising at least one processor and a memory storing instructions configured to cause the processor to receive an identification code from an IQ Microinverter associated with a corresponding PV module and, in response, send an authentication that causes or permits the identified microinverter to continue active operation. Because claim 16 is directed to the master-management-unit apparatus itself, Enphase directly infringes by making, using, selling, offering to sell, and/or importing Gateways containing the claimed processor, memory, and configured instructions.

197. Installers, customers, and end users also directly infringe at least claims 1 and 16 of the '139 Patent by using the accused IQ Gateways and their stored instructions in complete Enphase systems. Installers directly infringe by installing, configuring, provisioning,

commissioning, activating, validating, and testing systems in which the IQ Gateway discovers individual microinverters, receives their device identifiers, validates and registers the devices, sends responsive activation, authorization, configuration, and/or grid-profile communications, and permits the identified microinverters to continue active operation. Customers and end users further directly infringe by putting the Gateways and complete systems into service, controlling their operation, and obtaining the benefit of their identification, commissioning, monitoring, and control functionality.

198. Claims 1 and 16 directly reach the accused Gateway storage medium and master-management-unit apparatus without requiring attribution of a third party's method steps to Enphase. The foregoing commissioning and operating acts of installers and other third parties are also attributable to Enphase for purposes of direct infringement. Enphase directs and controls the commissioning process through the design of the Accused Products, the Enphase Installer App and Installer Platform, mandatory system-activation and device-validation workflows, Gateway device-discovery procedures, grid-profile requirements, installation and commissioning instructions, installer training and certification resources, and Enphase technical support. Enphase benefits from those acts because successful discovery, validation, and commissioning activate the Accused Products for their intended operation and enable Enphase's associated monitoring, management, and support services.

199. On information and belief, Enphase has had actual knowledge of the existence of the '139 Patent since at least November 1, 2017. A SunSpec Member's Briefing issued that day identified claims 1, 10, and 16 of the '139 Patent in connection with the SunSpec RSD Specification, and Enphase received, reviewed, or otherwise learned of that patent-specific disclosure through its SunSpec membership and participation in the rapid-shutdown workgroup.

Enphase had actual knowledge of Tigo's specific allegations that the Accused Products infringe the '139 Patent no later than the filing and service of this Complaint.

200. After acquiring knowledge of the '139 Patent and, no later than the filing and service of this Complaint, Tigo's specific infringement allegations, Enphase has indirectly infringed and continues to indirectly infringe at least claims 1 and 16 of the '139 Patent by active inducement pursuant to 35 U.S.C. § 271(b). Enphase has intentionally instructed, encouraged, and assisted installers, customers, and end users to directly infringe by, among other things: (1) selling, offering for sale, and/or importing IQ Gateways, IQ Combiners, IQ Microinverters, and related products for installation and operation in systems that infringe the '139 Patent either literally or under the doctrine of equivalents; (2) marketing the device-discovery, commissioning, activation, validation, grid-profile, monitoring, and control functionality of those products; and (3) providing the Enphase Installer App and Installer Platform, installation manuals, quick-install guides, device-discovery and array-building instructions, commissioning and grid-profile materials, installer training and certification resources, technical support, and other assistance directing the infringing use of the Accused Products. On information and belief, Enphase has continued these affirmative acts with the specific intent that the induced acts be performed and with knowledge that those acts constitute infringement of the '139 Patent.

201. Enphase has also indirectly infringed and continues to indirectly infringe at least claims 1 and 16 of the '139 Patent by contributory infringement pursuant to 35 U.S.C. § 271(c). In the alternative and to the extent any accused component is considered less than the complete claimed article, Enphase supplies Gateway firmware and software, IQ Microinverters, Installer App functionality, and associated commissioning configurations that constitute material parts of the claimed computer-readable storage medium and master-management-unit architecture. The

accused device-discovery, identifier-processing, validation, authentication, activation, and configuration functionality is especially made and/or especially adapted to perform the claimed identification-and-authentication workflow. When enabled and configured to perform that functionality, those accused components and configurations are not staple articles or commodities of commerce suitable for substantial noninfringing use and are known by Enphase to be especially made or adapted for use in infringement of the ’139 Patent.

202. Tigo has suffered and continues to suffer damages as a result of Enphase’s infringement of the ’139 Patent in an amount to be determined at trial.

203. Tigo has suffered and will continue to suffer irreparable harm unless Enphase’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for Enphase’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT SIX
## INFRINGEMENT OF U.S. PATENT NO. 9,143,036

204. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

205. Pursuant to 35 U.S.C. § 282, the claims of the ’036 Patent are presumed valid.

206. In view of the foregoing facts and allegations, including paragraphs 100–104 above, Enphase has infringed and continues to infringe claim 1 of the ’036 Patent pursuant to 35 U.S.C. § 271, at least by, without authority, making, using, testing, demonstrating, selling, offering to sell, and/or importing IQ8MC Microinverters and any additional Enphase Microinverter models containing the same or materially similar accused auxiliary-power-supply circuitry, and by inducing and/or contributing to infringement by others.

207. Claim 1 of the '036 Patent recites:

> **1**. A power supply, comprising:
>
> a first stage having an input connected to a voltage from a photovoltaic panel and an output providing a first voltage different from the voltage from the photovoltaic panel;
>
> a capacitor coupled to the output of the first stage;
>
> a second stage connected to receive power from the output of the first stage and from the capacitor, the second stage supplying power at a second voltage to a micro-controller; and:
>
> a circuit configured to prevent the second stage from being turned on to supply the power at the second voltage to the micro-controller, until the output of the first stage has charged the capacitor to a predetermined level sufficient to power the second stage to operate the micro-controller for a predetermined period of time even without the output of the first stage.

208. Enphase has directly infringed and continues to directly infringe claim 1 of the '036 Patent in violation of 35 U.S.C. § 271(a). Enphase directly infringes by making, using, testing, demonstrating, selling, offering to sell, and/or importing IQ8MC Microinverters and, on information and belief, any additional Enphase Microinverter models containing the same or materially similar internal auxiliary-power-supply circuitry configured as claimed. To the extent an actual connection to an energized photovoltaic module is required, Enphase also directly infringes through its own development, validation, testing, demonstrations, installer training, technical support, and troubleshooting involving microinverters connected to corresponding PV modules, including Enphase AC Module configurations.

209. Enphase's infringement is shown by way of the IQ8MC Microinverter and its internal auxiliary-power-supply architecture, as set forth in paragraphs 100–104 above. Those allegations demonstrate infringement of claim 1 of the '036 Patent by showing:

a. The IQ8MC contains an internal power supply having a first stage (converter) with an input connected to direct-current voltage from a

corresponding PV module and an output providing a first voltage different from the PV-module voltage;

b. A capacitor is coupled to the output of the first stage;

c. A second stage (converter) is connected to receive power from the output of the first stage and from the capacitor and supplies power at a second voltage to a microcontroller;

d. The internal circuitry prevents the second stage from turning on and supplying the second voltage to the microcontroller until the output of the first stage has charged the capacitor to a predetermined level; and

e. The predetermined level is sufficient to power the second stage and operate the microcontroller for a predetermined period even without the output of the first stage.

f. These structural and functional relationships satisfy the limitations of claim 1 either literally or under the doctrine of equivalents.

210. Other Enphase Microinverter models are included among the Accused Products for purposes of this Count only to the extent they contain the same or materially similar two-stage auxiliary-power-supply architecture alleged above and perform the same accused capacitor-charging, delayed-startup, and microcontroller-powering functionality. The inclusion of any additional model is based on its internal circuitry and functionality, rather than its designation as part of the IQ7 or IQ8 Series.

211. Installers, customers, and end users also directly infringe claim 1 of the ’036 Patent. Enphase instructs installers to mount the accused microinverters, connect each microinverter’s DC input to a corresponding PV module, complete the AC connections, commission the system, and

energize it. Those acts connect the claimed first-stage input to voltage from a photovoltaic panel and put the complete claimed power supply into service. When the system is energized, the internal auxiliary-power-supply circuitry automatically performs the claimed voltage conversion, capacitor charging, delayed activation, and microcontroller-powering operations. Customers and end users further directly infringe by operating the installed microinverters and obtaining the benefit of that functionality.

212. The foregoing acts of installers and other third parties are attributable to Enphase for purposes of direct infringement. Enphase directs and controls the installation, connection, commissioning, activation, and operation of the Accused Products through the design of the products, Enphase installation manuals and quick-install guides, AC Module requirements, the Enphase Installer App and Installer Platform, mandatory provisioning and commissioning workflows, installer training and certification resources, warranty requirements, and Enphase technical support. Enphase benefits from those acts because the resulting installation and activation enable the intended operation, monitoring, sale, and support of the Accused Products and expand the installed base of Enphase products and services.

213. On information and belief, Enphase has had actual knowledge of the existence of the '036 Patent since at least November 1, 2017. A SunSpec Member's Briefing issued that day identified claims 1, 8, and 18 of the '036 Patent in connection with the SunSpec RSD Specification, and Enphase received, reviewed, or otherwise learned of that patent-specific disclosure through its SunSpec membership and participation in the rapid-shutdown workgroup. Enphase had actual knowledge of Tigo's specific allegations that the Accused Products infringe the '036 Patent no later than the filing and service of this Complaint.

214. After acquiring knowledge of the ’036 Patent and, no later than the filing and service of this Complaint, Tigo’s specific infringement allegations, Enphase has indirectly infringed and continues to indirectly infringe claim 1 of the ’036 Patent by active inducement pursuant to 35 U.S.C. § 271(b). Enphase has intentionally instructed, encouraged, and assisted installers, customers, and end users to directly infringe by, among other things: (1) selling, offering for sale, and/or importing the accused microinverters for connection to PV modules and operation in complete photovoltaic systems that infringe claim 1 either literally or under the doctrine of equivalents; (2) marketing the power-conversion, module-level control, reliability, and communications capabilities enabled by the accused circuitry; and (3) providing installation manuals, quick-install guides, AC Module materials, commissioning tools, the Enphase Installer App and Installer Platform, training, certification resources, warranty requirements, technical support, and other assistance directing installers and users to connect and operate the accused microinverters in their intended infringing configurations. On information and belief, Enphase has continued these affirmative acts with the specific intent that the induced acts be performed and with knowledge that those acts constitute infringement of the ’036 Patent.

215. Enphase has also indirectly infringed and continues to indirectly infringe claim 1 of the ’036 Patent by contributory infringement pursuant to 35 U.S.C. § 271(c). Enphase manufactures, sells, offers to sell, and/or imports IQ8MC Microinverters and any additional Enphase Microinverter models containing the same or materially similar accused auxiliary-power-supply circuitry that constitutes a material part of the claimed power supply. The accused circuitry is especially made and/or especially adapted to receive PV-module voltage and perform the claimed two-stage conversion, capacitor-charging, delayed-startup, and microcontroller-powering functionality. The circuitry is integral to the intended operation of the accused microinverters and

operates automatically when the microinverters are connected and energized. It is therefore not a staple article or commodity of commerce suitable for substantial noninfringing use and is known by Enphase to be especially made or adapted for use in infringement of the ’036 Patent.

216. Tigo has suffered and continues to suffer damages as a result of Enphase’s infringement of the ’036 Patent in an amount to be determined at trial.

217. Tigo has suffered and will continue to suffer irreparable harm unless Enphase’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for Enphase’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT SEVEN
## INFRINGEMENT OF U.S. PATENT NO. 9,397,612

218. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

219. Pursuant to 35 U.S.C. § 282, the claims of the ’612 Patent are presumed valid.

220. In view of the foregoing facts and allegations, including paragraphs 96–99 above, Enphase has infringed and continues to infringe one or more claims of the ’612 Patent, including but not limited to exemplary claim 14, pursuant to 35 U.S.C. § 271. Enphase directly infringes by using, testing, demonstrating, configuring, commissioning, supporting, troubleshooting, monitoring, and/or operating Power Control-enabled Enphase Energy Systems in a manner that practices the claimed methods and by making, assembling, using, testing, demonstrating, commissioning, selling, offering to sell, and/or importing Power Control-enabled combinations that meet the asserted apparatus claims. Enphase also induces and/or contributes to infringement by others as alleged below.

221. Claim 14 of the ’612 Patent recites:

> **14**. An apparatus, comprising:
>
> at least one local management unit; and;
>
> a master control unit coupled with a sensor and configured to:
>
> > monitor the sensor for an anomaly;
> >
> > determine whether the sensor has detected the anomaly; and
> >
> > in response to a determination that the sensor has detected the anomaly:
> >
> > > determine whether the anomaly requires a control change; and
> > >
> > > issue a control change command to the local management unit in response to a determination that the anomaly requires a control change.

222. Enphase has directly infringed and continues to directly infringe one or more claims of the ’612 Patent in violation of 35 U.S.C. § 271(a). With respect to method claims, including claims 1–6, Enphase directly infringes by using, testing, demonstrating, configuring, commissioning, supporting, troubleshooting, monitoring, and/or operating Power Control-enabled Enphase Energy Systems in a manner that performs the claimed methods. With respect to apparatus claims, including claims 14–20, Enphase directly infringes by making, assembling, using, testing, demonstrating, commissioning, selling, offering to sell, and/or importing Power Control-enabled combinations containing IQ Microinverters, an IQ Gateway or IQ Combiner with integrated Gateway functionality, Production CTs, Battery CTs, Consumption CTs and/or an IQ Meter Collar, and related Enphase hardware and software.

223. For purposes of this Count, Power Control-enabled Enphase Energy Systems include installed Enphase systems configured to perform current-monitoring and production-limiting functions, including main-panel-upgrade avoidance with busbar-overload control, main-

panel-upgrade avoidance under the National Electrical Code 120% rule or a directly entered current limit, and aggregate power export limiting. Enphase's infringement is shown by way of those systems, as set forth in paragraphs 96–99 above, which demonstrate infringement of at least claim 14 of the '612 Patent by showing:

a. The IQ Microinverters map to the claimed local management units. Each IQ Microinverter converts power generated by a corresponding PV module into grid-compliant AC power, uses individual maximum power point tracking to control that module, and responds to production-control signals from the IQ Gateway;

b. The IQ Gateway, including an IQ Gateway integrated into an IQ Combiner, maps to the claimed master control unit. The Production CTs, Battery CTs, Consumption CTs and/or IQ Meter Collar map to the claimed sensor. The IQ Gateway is coupled with those sensors because it receives and monitors the current information they report and uses that information to control PV and energy-storage production;

c. The IQ Gateway monitors the sensors for an anomaly. The claimed anomaly is a monitored production, export, or backfeed current condition that exceeds an applicable configured Power Control limit, including a busbar-ampacity limit, National Electrical Code 120% rule limit, directly entered current limit, aggregate export limit, or similar electrical-system threshold;

d. The IQ Gateway determines whether the sensor has detected the anomaly by evaluating sensor-reported current information against the applicable configured limit. For example, Enphase describes a configuration in

which Production and Battery CTs monitor current being backfed into the main panel and feed that information to the IQ Gateway, which determines whether the backfed current has increased beyond a configured 32-ampere limit;

e. In response to determining that the applicable limit has been exceeded, the IQ Gateway determines whether the detected condition requires a control change by determining whether PV production, battery discharge, or other system output must be limited to maintain current within the configured limit; and

f. When a control change is required, the IQ Gateway sends an affirmative signal to the IQ Microinverters directing them to limit production. That signal functions as a control instruction that changes microinverter operation and maps to the claimed control change command issued to the local management unit.

224. Installers, customers, and end users also directly infringe one or more claims of the '612 Patent. Installers directly infringe the asserted apparatus claims by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and putting into service complete Power Control-enabled Enphase Energy Systems containing the claimed local management unit, master control unit, sensor, and associated hardware and software. For dependent claims 5–6 and 19–20, installers further make the claimed combinations by coupling IQ Microinverters with corresponding PV modules to control the electricity output generated by those modules. Installers, customers, and end users directly infringe the asserted method claims by configuring, commissioning, activating, testing, and/or operating the systems in a manner that causes the claimed sensor-monitoring, anomaly-determination, control-change determination, and

command-issuance steps to be performed. Customers and end users further directly infringe the apparatus claims by putting the complete systems into service, controlling their operation, and obtaining the benefit of their electrical-power and Power Control functionality.

225. The foregoing acts of installers and other third parties are attributable to Enphase for purposes of direct infringement. Enphase directs and controls the manner in which Power Control-enabled Enphase Energy Systems are assembled, installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, Enphase Power Control requirements and technical materials, Enphase installation manuals and quick-install guides, the Enphase Installer App and Installer Platform, provisioning and commissioning tools, installer training and certification resources, and Enphase technical support. Enphase benefits from those acts because the resulting assembly, installation, and commissioning enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of Enphase products and services. Accordingly, Enphase is responsible for those acts under principles of direction and control, agency, and vicarious liability, including with respect to making and using complete systems and performing the claimed methods.

226. On information and belief, Enphase has had actual knowledge of the existence of the ’612 Patent since at least November 1, 2017. A SunSpec Member’s Briefing issued that day identified claims 1, 7, and 14 of the ’612 Patent in connection with the SunSpec RSD Specification, and Enphase received, reviewed, or otherwise learned of that patent-specific disclosure through its SunSpec membership and participation in the rapid-shutdown workgroup. Enphase had actual knowledge of Tigo’s specific allegations that the Accused Products infringe the ’612 Patent no later than the filing and service of this Complaint.

227. After acquiring knowledge of the ’612 Patent and, no later than the filing and service of this Complaint, Tigo’s specific infringement allegations, Enphase has indirectly infringed and continues to indirectly infringe one or more claims of the ’612 Patent, including but not limited to exemplary claim 14, by active inducement pursuant to 35 U.S.C. § 271(b). Enphase has intentionally instructed, encouraged, and assisted installers, customers, and end users to directly infringe by, among other things: (1) selling, offering for sale, and/or importing the Accused Products for installation and operation in Power Control-enabled systems that infringe the ’612 Patent either literally or under the doctrine of equivalents; (2) marketing Power Control functionality, including real-time current monitoring, main-panel-upgrade avoidance, busbar-overload control, and aggregate export limiting; and (3) providing Power Control technical materials, installation manuals, quick-install guides, the Enphase Installer App and Installer Platform, commissioning tools, training, certification resources, technical support, and other assistance directing the installation of current sensors, entry of applicable current limits, commissioning of the systems, and operation of the Gateway-to-microinverter control sequence. On information and belief, Enphase has continued these affirmative acts with the specific intent that the induced acts be performed and with knowledge that those acts constitute infringement of the ’612 Patent.

228. Enphase has also indirectly infringed and continues to indirectly infringe one or more claims of the ’612 Patent by contributory infringement pursuant to 35 U.S.C. § 271(c). Enphase manufactures, sells, offers to sell, and/or imports IQ Gateways and IQ Combiners configured with Power Control software, IQ Microinverters, current-sensing products, and related Accused Products that constitute material parts of the claimed apparatuses and material apparatuses for use in practicing the claimed methods. The accused Power Control software,

configurations, and associated component combinations are especially made and/or especially adapted to perform the claimed sensor-monitoring, anomaly-determination, and responsive-control functionality. When enabled and configured to perform that functionality, they are not staple articles or commodities of commerce suitable for substantial noninfringing use and are known by Enphase to be especially made or adapted for use in infringement of the ’612 Patent. Enphase’s affirmative acts contribute to installers, customers, and end users directly infringing the ’612 Patent with the Accused Products.

229. Tigo has suffered and continues to suffer damages as a result of Enphase’s infringement of the ’612 Patent in an amount to be determined at trial.

230. Tigo has suffered and will continue to suffer irreparable harm unless Enphase’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for Enphase’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT EIGHT
## INFRINGEMENT OF U.S. PATENT NO. 9,966,848

231. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

232. Pursuant to 35 U.S.C. § 282, the claims of the ’848 Patent are presumed valid.

233. In view of the foregoing facts and allegations, including paragraphs 100–104 above, Enphase has infringed and continues to infringe claim 1 of the ’848 Patent pursuant to 35 U.S.C. § 271, at least by, without authority, making, using, testing, demonstrating, selling, offering to sell, and/or importing IQ8MC Microinverters and any additional Enphase Microinverter models

containing the same or materially similar accused auxiliary-power-supply circuitry, and by inducing and/or contributing to infringement by others.

234. Claim 1 of the ’848 Patent recites:

> **1**. An apparatus, comprising:
>
> a first stage power converter to generate a first output from a direct current input;
>
> a second stage power converter connected to the first stage power converter to convert the first output to a second output;
>
> a micro-controller;
>
> a power absorption circuit; and
>
> a control circuit coupled with the first stage power converter and the second stage power converter, the control circuit powered by the first output to control the second stage power converter, wherein:
>
>> when the second stage power converter is in a first mode of not providing the second output to power the micro-controller, the control circuit monitors a voltage of the first output powering the power absorption circuit and signals the second stage power converter to remain in the first mode during a time period in which the voltage is below a threshold; and
>>
>> when the voltage is above the threshold, the control circuit signals the second stage power converter to enter a second mode of providing the second output to power the micro-controller.

235. Enphase has directly infringed and continues to directly infringe claim 1 of the ’848 Patent in violation of 35 U.S.C. § 271(a). Enphase directly infringes by making, using, testing, demonstrating, selling, offering to sell, and/or importing IQ8MC Microinverters and, on information and belief, any additional Enphase Microinverter models containing the same or materially similar internal auxiliary-power-supply circuitry configured as claimed. Enphase also directly infringes through its own development, validation, testing, demonstrations, installer training, technical support, and troubleshooting involving the accused microinverters connected to and powered by corresponding PV modules.

236. Enphase's infringement is shown by way of the IQ8MC Microinverter and its internal auxiliary-power-supply architecture, as set forth in paragraphs 100–104 above. Those allegations demonstrate infringement of claim 1 of the '848 Patent by showing:

a. The IQ8MC contains a first-stage power converter that receives a direct-current input and generates a first output;

b. A second-stage power converter is connected to the first-stage power converter and converts the first output into a second output used to power a microcontroller;

c. The IQ8MC contains a power-absorption circuit and a control circuit coupled with the first- and second-stage power converters, with the control circuit powered by the first output and controlling operation of the second-stage power converter;

d. When the voltage of the first output is below a threshold, the control circuit monitors that voltage and causes the second-stage power converter to remain in a mode that does not supply the second output to the microcontroller; and

e. When the voltage exceeds the threshold, the control circuit causes the second-stage power converter to enter a mode that supplies the second output to power the microcontroller.

f. These structural and functional relationships satisfy the limitations of claim 1 either literally or under the doctrine of equivalents.

237. Other Enphase Microinverter models are included among the Accused Products for purposes of this Count only to the extent they contain the same or materially similar auxiliary-

power-supply architecture alleged above and perform the same accused first-stage conversion, power-absorption, threshold-monitoring, second-stage-control, and microcontroller-powering functionality. The inclusion of any additional model is based on its internal circuitry and functionality, rather than its designation as part of the IQ7 or IQ8 Series.

238. Installers, customers, and end users also directly infringe claim 1 of the '848 Patent. Enphase instructs installers to mount the accused microinverters, connect each microinverter's direct-current input to a corresponding PV module, complete the required AC connections, commission the system, and energize it. Those acts put the claimed apparatus into service and cause the internal auxiliary-power-supply circuitry automatically to perform the claimed first-stage conversion, voltage monitoring, threshold-responsive second-stage control, and microcontroller-powering operations. Customers and end users further directly infringe by operating the accused microinverters and obtaining the benefit of that functionality.

239. The foregoing acts of installers and other third parties are attributable to Enphase for purposes of direct infringement. Enphase directs and controls the installation, connection, commissioning, activation, and operation of the Accused Products through the design of the products, Enphase installation manuals and quick-install guides, AC Module requirements, the Enphase Installer App and Installer Platform, mandatory provisioning and commissioning workflows, installer training and certification resources, warranty requirements, and Enphase technical support. Enphase benefits from those acts because the resulting installation and activation enable the intended operation, monitoring, sale, and support of the Accused Products and expand the installed base of Enphase products and services. Accordingly, to the extent necessary, Enphase is responsible for those acts under principles of direction and control, agency,

and/or vicarious liability, including with respect to the making and use of complete systems and the use and performance of the claimed inventions.

240. Enphase had actual knowledge of the existence of the ’848 Patent no later than February 2, 2026. Tigo’s January 2, 2026 letter expressly identified the ’848 Patent, and Enphase’s February 2, 2026 response acknowledged Tigo’s patent portfolio. Enphase had actual knowledge of Tigo’s specific allegations that the Accused Products infringe the ’848 Patent no later than the filing and service of this Complaint.

241. After acquiring knowledge of the ’848 Patent and, no later than the filing and service of this Complaint, Tigo’s specific infringement allegations, Enphase has indirectly infringed and continues to indirectly infringe claim 1 of the ’848 Patent by active inducement pursuant to 35 U.S.C. § 271(b). Enphase has intentionally instructed, encouraged, and assisted installers, customers, and end users to directly infringe by, among other things: (1) selling, offering for sale, and/or importing the accused microinverters for connection to PV modules and operation in photovoltaic systems that infringe claim 1 either literally or under the doctrine of equivalents; (2) marketing the power-conversion, module-level control, reliability, startup, and communications capabilities enabled by the accused circuitry; and (3) providing installation manuals, quick-install guides, AC Module materials, commissioning tools, the Enphase Installer App and Installer Platform, training, certification resources, warranty requirements, technical support, and other assistance directing installers and users to connect and operate the accused microinverters in their intended infringing configurations. On information and belief, Enphase has continued these affirmative acts with the specific intent that the induced acts be performed and with knowledge, or willful blindness, that those acts constitute infringement of the ’848 Patent.

242. Enphase has also indirectly infringed and continues to indirectly infringe claim 1 of the ’848 Patent by contributory infringement pursuant to 35 U.S.C. § 271(c). In the alternative and to the extent an accused microinverter is considered less than the complete claimed apparatus without connection to a direct-current source or placement into operation, Enphase manufactures, sells, offers to sell, and/or imports IQ8MC Microinverters and any additional Enphase Microinverter models containing the same or materially similar accused auxiliary-power-supply circuitry that constitutes a material part of the claimed apparatus. The accused circuitry is especially made and/or especially adapted to receive PV-module voltage and perform the claimed first-stage conversion, power-absorption, threshold-monitoring, second-stage-control, and microcontroller-powering functionality. The circuitry is integral to the intended operation of the accused microinverters and operates automatically when the microinverters are connected and energized. It is therefore not a staple article or commodity of commerce suitable for substantial noninfringing use and is known by Enphase to be especially made or adapted for use in infringement of the ’848 Patent.

243. Tigo has suffered and continues to suffer damages as a result of Enphase’s infringement of the ’848 Patent in an amount to be determined at trial.

244. Tigo has suffered and will continue to suffer irreparable harm unless Enphase’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for Enphase’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT NINE

**INFRINGEMENT OF U.S. PATENT NO. 10,135,385**

245. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

246. Pursuant to 35 U.S.C. § 282, the claims of the ’385 Patent are presumed valid.

247. In view of the foregoing facts and allegations, including paragraphs 86–95 above, Enphase has infringed and continues to infringe one or more claims of the ’385 Patent, including at least claims 1, 10, and 11, with claim 10 plead as exemplary, pursuant to 35 U.S.C. § 271. Enphase infringes by, without authority, making, using, testing, demonstrating, selling, offering to sell, and/or importing IQ Series Microinverters containing the claimed computer-readable instructions and by making and using complete Enphase systems containing IQ Microinverters, IQ Gateways or IQ Combiners, and corresponding PV modules. Enphase also induces and/or contributes to infringement by others.

248. Claim 10 of the ’385 Patent recites:

> **10**. A non-transitory computer-readable storage medium storing thereon computer readable instructions configured to instruct a local management unit of a solar module to perform a method, the method comprising:
>
> sending a first identification code from a first local management unit to a master management unit, the first identification code associated with the first local management unit, and the first local management unit coupled to control the solar module;
>
> receiving, from the master management unit, an authentication of the first identification code;
>
> in response to receiving the authentication of the first identification code, continuing active operation of the first local management unit;
>
> establishing communication with the master management unit from a second local management unit of a plurality of local management units including the first local management unit;
>
> communicating to the master management unit a second identification code associated with the second local management unit;

> receiving, from the master management unit, an authentication of the second identification code; and
>
> in response to receiving the authentication of the second identification code, continuing active operation of the second local management unit.

249. Enphase has directly infringed and continues to directly infringe claim 10 of the ’385 Patent in violation of 35 U.S.C. § 271(a). Enphase directly infringes by making, using, testing, demonstrating, selling, offering to sell, and/or importing IQ Series Microinverters, including at least IQ8 Series Microinverters, containing non-transitory memory or other computer-readable storage media that store Enphase firmware and software instructions configured to perform the claimed identification-and-authentication operations. The same or materially similar firmware is stored and executed in multiple IQ Microinverters and configures at least first and second Microinverters to communicate their respective identifiers to an IQ Gateway or IQ Combiner, receive responsive authentication communications, and continue active operation.

250. Enphase’s infringement is shown by way of exemplary multi-module Enphase systems containing an IQ Gateway or IQ Combiner with integrated Gateway functionality, at least first and second IQ8 Series Microinverters, corresponding PV modules, the Enphase Installer App and Installer Platform, and associated commissioning and power-line-communication functionality, as set forth in paragraphs 86–95 above. Those allegations demonstrate infringement of claim 10 by showing:

a. Each IQ Microinverter contains non-transitory memory or other computer-readable storage media that store Enphase firmware and software instructions. Each Microinverter maps to a claimed local management unit and is coupled to and controls the operation and output of a corresponding PV module through its controller, power-conversion circuitry, individual maximum power point tracking, communications circuitry, and associated

firmware;

b. The IQ Gateway or IQ Combiner containing integrated Gateway functionality maps to the claimed master management unit. It communicates with multiple IQ Microinverters over the installation's AC power lines and performs device discovery, commissioning, validation, registration, activation, grid-profile configuration, monitoring, and control functions;

c. During Enphase's device-discovery and commissioning process, a first IQ Microinverter sends or otherwise communicates to the Gateway a unique serial number or corresponding coded device identifier that maps to the claimed first identification code. Enphase documentation identifies Microinverter serial numbers as "discovered" through an Envoy or Gateway scan, and the Enphase Installer App and Installer Platform display the serial numbers of the Microinverters discovered by and communicating with the Gateway;

d. On information and belief, in response to receiving the first Microinverter's identification code, the Gateway performs device-specific validation, pairing, registration, activation, authorization, and/or configuration operations and sends a corresponding authentication to the first Microinverter. That responsive authentication includes one or more device-validation, pairing, activation, authorization, configuration, and/or grid-profile communications confirming that the identified Microinverter is recognized and authorized for operation in the particular Enphase system;

e. In response to receiving the authentication, the first Microinverter enters or continues normal active operation. Functional testing demonstrated that new

IQ8 Microinverters required commissioning with an IQ Gateway before operating. Following device discovery, validation, commissioning, and application of the appropriate grid profile, the Enphase Installer App identifies the Microinverter as online, communicating, and producing power. The grid profile supplies operating parameters necessary for grid compliance and interoperability and thereby permits the identified Microinverter to continue active operation within the commissioned system;

f. A second IQ Microinverter separately establishes communication with the Gateway and sends or otherwise communicates its own unique serial number or coded device identifier, which maps to the claimed second identification code. The Gateway performs the same device-specific validation, pairing, registration, activation, authorization, and/or configuration operations for the second Microinverter and sends a corresponding authentication of the second identification code; and

g. In response to receiving that authentication, the second Microinverter likewise enters or continues active operation. Enphase's commissioning workflow discovers and validates each Microinverter individually, displays the status and serial number of each identified device, propagates the selected grid profile to the detected Microinverters, and permits the installer to confirm that each device has received the applicable profile and is communicating and producing power. Accordingly, the accused firmware and commissioning architecture perform the complete two-Microinverter identification-and-authentication sequence recited in claim 10, either literally or under the doctrine

of equivalents.

251. Enphase also directly infringes claim 1 of the ’385 Patent through its own use, testing, demonstration, validation, commissioning, technical support, and troubleshooting of complete Enphase systems. During those activities, Enphase uses systems containing an IQ Gateway or IQ Combiner, multiple IQ Microinverters, and corresponding PV modules to perform the claimed method. At least first and second IQ Microinverters communicate their respective identifiers to the Gateway, receive responsive authentication communications, and, in response, continue active operation.

252. Enphase also directly infringes claim 11 of the ’385 Patent by making, assembling, using, testing, demonstrating, commissioning, and/or operating complete Enphase systems containing multiple PV modules, corresponding IQ Microinverters, and an IQ Gateway or IQ Combiner. Each IQ Microinverter contains memory storing software instructions and a controller configured through those instructions to perform the claimed identification-and-authentication operations. On information and belief, Enphase undertakes those activities through research and development, validation, testing, demonstrations, installer training, technical support, troubleshooting, and activities involving AC Modules that combine Enphase Microinverters with corresponding PV modules.

253. Installers, customers, and end users also directly infringe claims 1, 10, and 11 of the ’385 Patent. Installers directly infringe by assembling, installing, configuring, provisioning, commissioning, validating, activating, and testing complete Enphase systems containing multiple PV modules, corresponding IQ Microinverters, and an IQ Gateway or IQ Combiner. Through the Enphase Installer App and Installer Platform, installers cause the Gateway to discover the individual Microinverters, receive their respective identifiers, validate and register the devices,

transmit responsive authentication and configuration communications, and permit the Microinverters to continue active operation. Customers and end users further directly infringe by putting the accused Microinverters, their stored instructions, and the complete commissioned systems into service and obtaining the benefit of the claimed identification, authentication, and continued-operation functionality.

254. The foregoing installation and commissioning acts of installers and other third parties are attributable to Enphase for purposes of direct infringement. Enphase directs and controls the commissioning process through the design of the Accused Products, the Enphase Installer App and Installer Platform, Gateway device-discovery procedures, device-validation and system-activation workflows, grid-profile requirements, installation and commissioning instructions, installer training and certification resources, warranty requirements, and Enphase technical support. Enphase benefits from those acts because successful discovery, validation, authentication, and commissioning activate the Accused Products for their intended operation and enable Enphase's associated monitoring, management, and support services.

255. Enphase had actual knowledge of the existence of the '385 Patent no later than February 2, 2026. Tigo's January 2, 2026 letter expressly identified the '385 Patent, and Enphase's February 2, 2026 response acknowledged Tigo's patent portfolio. Enphase had actual knowledge of Tigo's specific allegations that the Accused Products infringe the '385 Patent no later than the filing and service of this Complaint.

256. After acquiring knowledge of the '385 Patent and, no later than the filing and service of this Complaint, Tigo's specific infringement allegations, Enphase has indirectly infringed and continues to indirectly infringe claims 1, 10, and 11 of the '385 Patent by active inducement pursuant to 35 U.S.C. § 271(b). Enphase has intentionally instructed, encouraged, and

assisted installers, customers, and end users to directly infringe by, among other things: (1) selling, offering for sale, and/or importing IQ Microinverters, IQ Gateways, IQ Combiners, and related products for installation and operation in systems that infringe the ’385 Patent either literally or under the doctrine of equivalents; (2) marketing the device-discovery, serial-number identification, commissioning, validation, activation, grid-profile, monitoring, and control functionality of those products; and (3) providing the Enphase Installer App and Installer Platform, installation manuals, quick-install guides, device-discovery and array-building instructions, commissioning materials, grid-profile materials, installer training and certification resources, technical support, and other assistance directing the infringing installation and operation of the Accused Products. On information and belief, Enphase has continued these affirmative acts with the specific intent that the induced acts be performed and with knowledge, or willful blindness, that those acts constitute infringement of the ’385 Patent.

257. Enphase has also indirectly infringed and continues to indirectly infringe claims 1, 10, and 11 of the ’385 Patent by contributory infringement pursuant to 35 U.S.C. § 271(c). Enphase manufactures, sells, offers to sell, and/or imports IQ Microinverters containing firmware, memory, controllers, communications circuitry, identifier-processing logic, and commissioning functionality that constitute material parts of the claimed computer-readable storage medium, method, and system. The accused firmware and associated functionality are especially made and/or especially adapted to communicate Microinverter identifiers to an IQ Gateway or IQ Combiner, process responsive device-validation and authentication communications, and permit identified Microinverters to continue active operation. When supplied and configured to perform that functionality, those accused components are not staple articles or commodities of commerce

suitable for substantial noninfringing use and are known by Enphase to be especially made or adapted for use in infringement of the ’385 Patent.

258. Tigo has suffered and continues to suffer damages as a result of Enphase’s infringement of the ’385 Patent in an amount to be determined at trial.

259. Tigo has suffered and will continue to suffer irreparable harm unless Enphase’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for Enphase’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## COUNT TEN
## INFRINGEMENT OF U.S. PATENT NO. 10,256,770

260. Tigo restates and realleges each of the assertions set forth in the preceding paragraphs.

261. Pursuant to 35 U.S.C. § 282, the claims of the ’770 Patent are presumed valid.

262. In view of the foregoing facts and allegations, including paragraphs 78–99 above, Enphase has infringed and continues to infringe one or more claims of the ’770 Patent, including but not limited to exemplary claim 1, pursuant to 35 U.S.C. § 271. Enphase directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating complete Enphase IQ systems and AC Module configurations containing the claimed photovoltaic-panel architecture. Enphase also induces and/or contributes to infringement by supplying Accused Products for incorporation into and use in infringing configurations as alleged below.

263. Claim 1 of the ’770 Patent recites:

> **1**. A photovoltaic panel, comprising:
>
> at least one photovoltaic cell;

> a local unit configured on the photovoltaic panel, the local unit having:
>
> > a voltage regulator coupled to the at least one photovoltaic cell to receive electric power generated by the at least one photovoltaic cell; and
> >
> > a controller coupled to the voltage regulator;
>
> wherein the voltage regulator provides a power output of the photovoltaic panel using the electric power generated by the at least one photovoltaic cell;
>
> wherein the controller communicates with a remote unit, disposed at a location remote from the local unit, to control operations of the voltage regulator;
>
> wherein a sensor is monitored for an anomaly; and
>
> wherein in response to a determination that the sensor has detected the anomaly, the controller causes the voltage regulator to shut down the power output of the photovoltaic panel based on a communication with the remote unit.

264. Enphase has directly infringed and continues to directly infringe one or more claims of the ’770 Patent in violation of 35 U.S.C. § 271(a). Enphase directly infringes by making, assembling, using, testing, demonstrating, commissioning, and/or operating complete Enphase IQ systems containing PV modules, IQ Microinverters, IQ Gateways or IQ Combiners with integrated Gateway functionality, current sensors and/or IQ Meter Collars, and related Enphase hardware and software. On information and belief, Enphase undertakes such activities through research, development, validation, testing, demonstration, installer training, and technical-support activities. Enphase also directly infringes through its own activities involving AC Modules that integrate Enphase microinverters with PV modules.

265. Enphase’s infringement is shown by way of exemplary Enphase IQ systems containing IQ Series Microinverters, including, for example, IQ7 and IQ8 Series Microinverters, IQ Gateways, current sensors and/or IQ Meter Collars, and corresponding PV modules, as set forth

in paragraphs 78–99 above. Those allegations demonstrate infringement of at least claim 1 of the ’770 Patent by showing:

a. Each complete accused system contains one or more PV modules comprising photovoltaic cells. Enphase instructs that each IQ Microinverter be individually connected to a corresponding PV module, with the module’s DC conductors connected directly to the microinverter. In Enphase AC Modules, the microinverter is integrated with or mounted directly to the corresponding PV module;

b. The IQ Microinverter maps to the claimed local unit configured on the photovoltaic panel. The microinverter’s power-conversion and maximum-power-point-tracking circuitry maps to the claimed voltage regulator, and the microinverter’s controller is coupled to and controls that circuitry;

c. The IQ Microinverter receives DC electric power generated by the corresponding photovoltaic cells and uses its power-conversion circuitry to provide a grid-compliant AC power output from the photovoltaic module;

d. The IQ Gateway, including an IQ Gateway integrated into an IQ Combiner, maps to the claimed remote unit. The IQ Gateway is disposed remotely from the module-level microinverter, communicates with IQ Microinverters over the site’s AC power lines, and provides monitoring and control of the IQ Microinverters, including control of their power production;

e. Production CTs, Battery CTs, Consumption CTs and/or the IQ Meter Collar map to the claimed sensor. Those sensors monitor and report production, consumption, export, and/or backfeed current to the IQ Gateway. The claimed

anomaly includes a detected current, export, or backfeed condition exceeding an applicable configured feeder-current, busbar-ampacity, export, or other electrical-system limit; and

f. In response to the over-limit condition, the IQ Gateway sends a signal to the IQ Microinverters directing them to limit production. The controller in each IQ Microinverter responds to that communication by controlling its power-conversion circuitry to reduce the duty cycle and power output associated with the corresponding PV module to a safe level, including reducing output to zero when required. The controller thereby causes the voltage regulator to shut down the power output based on communication with the remote unit. Additionally or alternatively, in Enphase rapid-shutdown configurations in which remote Enphase equipment communicates the applicable shutdown state or command, the microinverter controller stops DC-to-AC conversion and cuts off voltage at the module level in response to a grid-disconnection, AC-breaker-trip, inverter-fault, or other detected shutdown condition.

266. Installers, customers, and end users also directly infringe one or more claims of the ’770 Patent. Installers directly infringe by assembling, installing, connecting, configuring, provisioning, commissioning, testing, and putting into service complete Enphase IQ systems containing PV modules, IQ Microinverters, IQ Gateways, current sensors and/or IQ Meter Collars, and the associated control software. Through those activities, installers combine the PV cells with the corresponding module-level microinverter, voltage regulator, controller, remote unit, and sensor to make the claimed photovoltaic panel. Installers, customers, and end users further directly

infringe by putting the complete systems into service, controlling their operation, and obtaining the benefit of their electrical-power, monitoring, Power Control, and safety functionality.

267. The foregoing acts of installers and other third parties are attributable to Enphase for purposes of direct infringement. Enphase directs and controls the manner in which complete Enphase IQ systems are assembled, installed, connected, configured, provisioned, commissioned, activated, monitored, and operated through the design of the Accused Products, Enphase installation manuals and quick-install guides, Power Control and rapid-shutdown requirements, grid profiles and system settings, the Enphase Installer App and Installer Platform, provisioning and commissioning tools, installer training and certification resources, and Enphase technical support. Enphase benefits from those acts because the resulting assembly and commissioning enables the intended sale, activation, operation, monitoring, and support of the Accused Products and expands the installed base of Enphase products and services. Accordingly, Enphase is responsible for those acts under principles of direction and control, agency, and vicarious liability, including with respect to making and using complete systems and performing the claimed methods.

268. Enphase had actual knowledge of the existence of the ’770 Patent no later than February 2, 2026. Tigo’s January 2, 2026 letter expressly identified the ’770 Patent, and Enphase’s February 2, 2026 response acknowledged Tigo’s patent portfolio. Enphase had actual knowledge of Tigo’s specific allegations that the Accused Products infringe the ’770 Patent no later than the filing and service of this Complaint.

269. After acquiring knowledge of the ’770 Patent and, no later than the filing and service of this Complaint, Tigo’s specific infringement allegations, Enphase has indirectly infringed and continues to indirectly infringe one or more claims of the ’770 Patent, including but

not limited to exemplary claim 1, by active inducement pursuant to 35 U.S.C. § 271(b). Enphase has intentionally instructed, encouraged, and assisted installers, customers, and end users to directly infringe by, among other things: (1) selling, offering for sale, and/or importing IQ Microinverters, IQ Gateways, IQ Combiners, current sensors, IQ Meter Collars, and related products for assembly and operation with PV modules in systems that infringe the ’770 Patent either literally or under the doctrine of equivalents; (2) marketing the module-level power-conversion, Gateway control, Power Control, grid-protection, and rapid-shutdown capabilities of the Accused Products; and (3) providing installation manuals, quick-install guides, Power Control technical materials, grid profiles, the Enphase Installer App and Installer Platform, commissioning tools, training, certification resources, technical support, and other assistance directing the infringing assembly, configuration, commissioning, and operation of complete systems. On information and belief, Enphase has continued these affirmative acts with the specific intent that the induced acts be performed and with knowledge that those acts constitute infringement of the ’770 Patent.

270. Enphase has also indirectly infringed and continues to indirectly infringe one or more claims of the ’770 Patent by contributory infringement pursuant to 35 U.S.C. § 271(c). Enphase manufactures, sells, offers to sell, and/or imports IQ Microinverters, IQ Gateways, IQ Combiners, Power Control software and configurations, and related Accused Products that constitute material parts of the claimed photovoltaic panel. The accused module-level power-conversion and sensor-responsive control configurations are especially made and/or especially adapted for combination with PV modules to perform the claimed remote-control and responsive-shutdown functionality. When supplied and configured to perform that functionality, those accused combinations are not staple articles or commodities of commerce suitable for substantial

noninfringing use and are known by Enphase to be especially made or adapted for use in infringement of the ’770 Patent. Enphase’s affirmative acts contribute to installers, customers, and end users directly infringing the ’770 Patent.

271. Tigo has suffered and continues to suffer damages as a result of Enphase’s infringement of the ’770 Patent in an amount to be determined at trial.

272. Tigo has suffered and will continue to suffer irreparable harm unless Enphase’s infringement is enjoined by this Court. Tigo is entitled to all remedies available under the patent laws, including damages adequate to compensate for Enphase’s infringement, enhanced damages for willful infringement, pre- and post-judgment interest, costs, and, where appropriate, injunctive relief under 35 U.S.C. § 283.

## JURY TRIAL DEMANDED

Tigo hereby demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tigo Energy Innovations LLC respectfully requests that this Court grant the following relief to Tigo Energy Innovations LLC:

A. Enter judgment that Enphase has infringed, both directly and indirectly, one or more claims of each of the Tigo Patents and continues to infringe those claims through: (1) the manufacture, use, offering to sell, and/or sale in the United States, and/or the importation into the United States, of infringing Enphase products; (2) the practice of claimed methods of the Tigo Patents by manufacturing, using, and/or testing Enphase products in the United States; and (3) the inducement of third parties to engage in such infringing activity with knowledge of the Tigo Patents and of the third parties’ infringing actions;

B. Enter judgment increasing the damages up to three times the amount found or assessed based on Enphase’s willful infringement;

C. Enter judgment awarding Tigo monetary relief pursuant to 35 U.S.C. § 284 in an amount adequate to compensate for Enphase's infringement of the Tigo Patents to be determined at trial, but not less than a reasonable royalty, awarding Tigo all pre- and post-judgment interest and costs, and awarding Tigo enhanced damages for Enphase's willful infringement of the Tigo Patents;

D. Enter a permanent injunction pursuant to 35 U.S.C. § 283 enjoining Enphase, its officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any of them and who receive actual notice of the injunction, from further infringing the Tigo Patents;

E. If a permanent injunction is not granted, or to the extent any continuing infringement is not enjoined, enter an order that Enphase pay to Tigo ongoing royalties in an amount to be determined for any infringement occurring after the date judgment is entered;

F. Enter an order, pursuant to 35 U.S.C. § 285, declaring this an exceptional case and awarding to Tigo its reasonable attorneys' fees; and

G. Enter an order awarding to Tigo such other and further relief, whether at law or in equity, that this Court deems just, equitable, and proper.

Dated: August 19, 2026

Respectfully submitted,

*/s/ Case Collard*

Case Collard (admitted)
State Bar No. 40692
collard.case@dorsey.com
**DORSEY & WHITNEY LLP**
1400 Wewatta Street, Suite 400
Denver, CO 80202
(303) 629-3400(main)
(303) 629-3450(facsimile)

*/s/ Mark D. Siegmund*
Mark D. Siegmund
Texas Bar No. 24117055
**CHERRY JOHNSON SIEGMUND JAMES PC**
Bridgeview Center
7901 Fish Pond Road, 2nd Floor
Waco, Texas 76710
Telephone: (254) 732-2242
Facsimile: (866) 627-3509
msiegmund@cjsjlaw.com

**ATTORNEYS FOR PLAINTIFF TIGO ENERGY INNOVATIONS LLC**